Argued December 14, 1932; affirmed February 7;
rehearing denied April 4, 1933

FLANDERS ET AL. *v.* WHITE ET AL.

(18 P. (2d) 823)

*J. J. Crossley* and *Palmer Fales,* both of Portland (Platt, Platt, Fales, Smith & Black, of Portland, on the brief), for appellants.

*Nicholas Jaureguy,* of Portland (Cake & Cake and Jaureguy & Tooze, all of Portland, on the brief), for respondents.

ROSSMAN, J.  This appeal presents for consideration the doctrine of dependent relative revocation which regards as mutually dependent the acts of one who destroys his will and thereupon proceeds to substitute in its place another instrument for the distribution of his bounty when the two acts are the result of one plan.  It is often said that this doctrine employs

the equitable principles which relieve from the ill effects of mistake, and holds that if the second instrument, due to faulty execution or other cause, is incapable of giving effect to the deceased's intent, his destruction of the first was induced by mistake and therefore unaccompanied by animus revocandi. The doctrine assumes that the testator would have preferred distribution in conformity to the destroyed will rather than intestacy. It is a doctrine of presumed intention and aims to give effect to the real intention of the deceased.

Before we proceed further with a consideration of the above principles of law, let us familiarize ourselves with the facts before us. Mr. Flanders died May 6, 1930, aged 82 years. His wife had predeceased him several months. They had no children. Some of the proponents are the beneficiaries named in the will. The contestants are the two brothers of the deceased, and the three descendents of a deceased brother. Two of the beneficiaries named in the will are the two aforementioned brothers. To one of them is bequeathed $5, and to the other $500. A sister is bequeathed $10,000, and two friends are remembered with bequests of $1,000 each, while to a third is given $10,000. Seven of the beneficiaries are nieces and nephews of the deceased. To three of them is bequeathed $1,000 each; to two of them, $10,000 each; to the sixth, $5,000; and to the seventh, Mary J. White, $20,000, together with the residue of the estate.

The only evidence adduced in the circuit court was that which the proponents presented. The contestants do not challenge its verity. It shows that Mr. Flanders executed his will September 20, 1929, and then carried the document away. It was not seen thereafter during his life. A very diligent search failed to locate it after

his death. The will was prepared by Mr. W. M. Cake who had been Mr. Flanders' attorney for more than forty years, and who had prepared for him several other wills. According to Judge Cake, Mr. Flanders conferred with him several times after the execution of the will of 1929, discussing that instrument and his estate, but remaining entirely satisfied with the manner in which the will would distribute the estate. Two or three months after the execution of the will Mr. Flanders asked Judge Cake to estimate the probable expense to which the estate would be subjected in the probate court, and received the reply that the expenses, including inheritance taxes, would amount to approximately $15,000. Sometime before his death, Mr. Flanders converted all of his estate into intangible personal property and shortly before his death shipped substantially all of this property to this aforementioned niece, Mary J. White, who resided in the state of New Hampshire, and whom he regarded as his favorite. In February, 1930, he sent her a small account book, upon the flyleaf of which he had inscribed the following messages:

"Miss Mary J. White,

February 15, 1930.

This book indicates what I want done with what funds I have left when I pas away.

It is my wish that you have full charge of all my property of what ever nature and to dispence with as near as you can with the accounts in this book.

All funds left after these accounts are settled belong to Mary J. White.

Geo. C. Flanders".

"February 15th, 1930.

Take all the time you want to pay the accounts and pay in money or bonds or other payper you may have on hand.

Geo. C. Flanders".

Upon the inside pages of this book Mr. Flanders opened an account between himself and each of the beneficiaries mentioned in the will. He credited each beneficiary with an amount which, in most instances, was the same as that stated in the will, and left a space where Miss White could enter the debit upon payment. By way of illustration, we quote one of these entries:

"Earl Flanders, Dr.                    Earl Flanders, Cr.
                        1930
                        Feby. 15, One Thousand Dollars
                                With Out interest".

In other words, his book sought to convert his beneficiaries into creditors and make himself the debtor of the group. The entries in the book are precisely the same as the bequests of the will with the following exceptions: The aforementioned brother, to whom Mr. Flanders' will bequeathed $500, is credited in the book with only $50; a niece, to whom the will bequeathed $10,000, is credited in the book with only $5,000; and still another, who is unnamed in the will, is credited in the book with $1,000. Thus, the book entries are not more favorable to any of the contestants than the provisions of the will.

February 24, 1930, when Mr. Flanders sent to Mary J. White this book, he wrote to her a letter which we shall now quote:

"Feby. 24th, 1930.
Dear Mary:
Today I am sending to you by registered mail the little account book, this takes the place of a will. I wrote you about this a few days ago. If this book will not go in your box hide it some place in the house. I found out it would cost $15,000 to administer my estate and under this plan you could do it for much less and save that for your self. You can look this book

through and get familiar with it. I may make some changes in it later. Dont think I am going to turn up my toes right away for I dont intend to but I am a man that looks ahead for brakers. The ballance of the bonds and mortgage will go ford in a day or two I expet and then I am going down to Seaside to take a rest and some salt air. Will keep you posted by air mail as to my addres.

Love to you and Sister

George X X X X X X X

P. S. I will explain a little these accounts shown in the book give the names of those who I want to give my funds to and give them credit for the amount and when they are paid charge the account and they are settlid and no publisity. Part of the amount can be paid at a time.

George''.

Clearly, he believed that by substituting the above debit-credit plan for the will he could avoid the $15,000 expense item, and thus increase Mary J. White's bequest to that extent.

In addition to the will which we have already reviewed, Mr. Flanders had executed two others, one in 1928 and another in 1923. These two wills pursued the same general plan for the distribution of his bounty that was adopted by the 1929 will and by the book entries; that is, they preferred Flanders' nieces and nephews to his two elderly brothers. Each of them also bequeathed to Mary J. White $20,000, a sum twice that given to any other beneficiary. The differences between the wills were in matters of detail only and resulted apparently from Mr. Flanders' belief that the conditions of his proposed beneficiaries had undergone changes. It will be recalled that Judge Cake testified that after the execution of the 1929 will Mr. Flanders repeatedly manifested satisfaction with the plan of

distribution which he had adopted. It will also be observed that the two letters written by Mr. Flanders about two and one-half months prior to his death affirmed the plan. Thus, we have cogent proof showing the plan which Mr. Flanders had adopted for the distribution of his estate, and also indicating that up to the time when he prepared the book entries he was still completely satisfied with that plan. We also see that the book entries employed the same plan. Likewise, all of the foregoing indicates that Mr. Flanders never intended to die intestate. Intestacy would grant Mary J. White, his favorite niece, nothing. It would bring to one of the contestants, who is given only $5 in each of the three wills and the book entries, approximately $21,250. Nine of those who are remembered in the book accounts (eight of whom are also named in the will) would receive nothing under intestacy. Intestacy would grant substantial sums to two relatives who were named in none of the wills and whose names do not appear in the book.

██ It is true, as the contestants urge, that no one saw Mr. Flanders destroy the 1929 will; nevertheless, the fact that it remained in his exclusive possession after he carried it away from Judge Cake's office, and the circumstance that diligent search failed to locate it after his death create a presumption that Mr. Flanders destroyed it with the intention of revoking it. *In re McCoy's Will,* 49 Or. 579 (90 P. 1105); *In re Millers' Will,* 49 Or. 452 (90 P. 1002, 124 Am. St. Rep. 1051, 14 Ann. Cas. 277). However, we need not base a finding that he destroyed his will upon that presumption because the evidence indicates that he himself destroyed the instrument. In his letter of February 24, 1930, to Mary J. White he wrote (referring to the account book): "This takes the place of a will." Clearly, this

statement referred to the will of September 20, 1929, because he had prepared no other since 1928. This statement, together with the entry dated February 15, 1930, in the account book, which recites: "This book indicates what I want done with what funds I have left when I pass away" are statements appropriate for one who has destroyed his will. Accordingly, we conclude that Flanders destroyed the will of 1929. The evidence made the same impression upon counsel (Mr. J. J. Crossley) for one of the groups of contestants. We quote from his brief: "The decedent, Flanders, after executing the alleged will on September 20, 1929, and shortly thereafter having found out it would cost $15,000 or more including a large amount of inheritance tax to the state of Oregon to probate and administer his estate under the will, he deliberately and totally destroyed said alleged will with the intent of completely revoking the same and he proceeded immediately to convert all his property into liquid assets".

██ From the fact that the testator destroyed his will, we presume that he intended to revoke it, but this presumption is a disputable one. 1 Woerner, The American Law of Administration (3d Ed.) § 128. Destruction of a testamentary instrument is an equivocal act. It may result from a desire to revoke, based upon a correct understanding or from a desire founded upon error, where a true conception of the conditions would have resulted otherwise. Proponents contend that the destruction resulted from Mr. Flanders' mistaken belief that the entries in the account book constituted effective directions for the distribution of his estate. We believe that the evidence justifies a finding that the deceased mistakenly believed that the entries of credits in his book in favor of those to whom he wished his

estate distributed would serve the intended purpose. Before expressing our opinion upon the problem whether that mistake caused him to destroy his will, let us revert to a consideration of the doctrine of dependent relative revocation. Professor Joseph Warren in 33 Harvard Law Review 337, in a scholarly article entitled "Dependent Relative Revocation" states that, as early as 1788, Powell on Devises employed the term just quoted and defined its meaning thus:

"This principle, that the effect of the obliteration, cancelling, etc., depends upon the mind with which it is done, having been pursued in all its consequences, has introduced another distinction not yet taken notice of; namely, that of dependent relative revocations, in which the act of cancelling, etc., being done with reference to another act meant to be an effectual disposition, will be a revocation or not, according as the relative act is efficacious or not".

1 Jarman on Wills (7th Ed.), p. 135, thus states the rule:

"Where the act of destruction is connected with the making of another will, so as fairly to raise the inference that the testator meant the revocation of the old to depend upon the efficacy of the new disposition intended to be substituted, such will be the legal effect of the transaction; and therefore, if the will intended to be substituted is inoperative from defect of attestation or any other cause, the revocation fails also, and the original will remains in force".

From Woerner, The American Law of Administration (3d Ed.), § 48, we quote:

"So the cancellation of a will, or of part of a will made with the intention to execute a new will (as a step in the process of effecting a change in the testamentary disposition already made), will not be deemed a revocation, if the purpose of the testator fails. This principle is stated by Williams to have resulted in 'the

doctrine of dependent relative revocations, in which the act of cancelling, etc., being done with reference to another act, meant to be an effectual disposition, will be a revocation or not, according as the relative act be efficacious or not.' It has been extended to include, as inoperative, cancellations made under the influence of a mistake in point of law, as well as in point of fact. This seems to carry the doctrine as far as the most lenient indulgence and anxious solicitude to give effect to the intention of testators, unlearned in the law or misled as to facts, can safely permit''.

In an extensive annotation accompanying *Henry v. Fraser,* 62 A. L. R. 1364 (58 App. D. C. 260, 29 Fed. (2d) 633), the editor summarizes the holdings thus:

''When a will or portions thereof, are cancelled or mutilated in order to change the will in whole or in part, and the attempt fails for want of due authentication or other cause, this effort to revoke in whole or in part will be treated as relative and dependent upon the efficacy of the new disposition intended to be substituted; and hence, if the attempted disposition is inoperative, the revocation fails also, and the original will remains in force. This rule is styled the doctrine of dependent relative revocation. It is based upon the presumption that the testator performed the act of revocation with a view and for the purpose of making some other disposition of his property in place of that which was cancelled and that there is, therefore, no reason to suppose that he would have made the change if he had been aware that it would have been wholly futile but that his wishes with regard to his property as expressed in his original will would have remained unchanged in the absence of any known and sufficient reason for changing them''.

Two penetrating analyses of the doctrine appear in the law reviews. Professor Warren, in 33 Harvard Law Review 337, suggests that the revoking act, when not absolute, may have been conditional upon the validity of the substitute instrument; or upon a mistaken belief that the substitute instrument constituted

a valid, effective means for the distribution of the estate. If conditional, he points out that the act of destruction does not amount to revocation unless the condition takes place. If it was induced by a mistake, he argues that the equity powers of the court can set it aside, and thus the way is cleared to probate the will. Mr. Francis T. Cornish, in an exhaustive article published in 5 So. Cal. Law Rev. 273, agrees with Professor Warren's treatment of conditional revocations, but holds that equity alone cannot relieve from a revocation induced by a mistake because the statutes require a republication of a will once revoked. In the latter type of instances, Mr. Cornish argues that the deceased never intended to revoke his will. We quote from his language:

"So we can say that when the latter document fails to operate as intended because of some defect in its execution, it cannot be interposed as a revocation of an existing will, not because the revocation failed for want of the happening of some condition, nor because the testator made a mistake in which the court could rely in setting aside the revocation, but because the testator never intended the instrument to operate as a revocation independent of its effectiveness as a will; that is, because there was no animus revocandi and, consequently, no revocation. The first will was always the last will and testament of the deceased".

The briefs of the parties cite many decisions of the courts wherein the above principle was applied or rejected. We have read all of them, together with several of those cited in the above texts. They neither add to nor detract from the above statements of the principle. The main difference between the decisions is that the English courts have not been hesitant in the application of the principle whereas most of the American courts are inclined to be conservative.

■ Based upon our review of the authorities, we conclude that if a deceased's acts in destroying his present

will and his substitution of a new means for the distribution of his estate are accompanied with circumstances that indicate the two acts are parts of one plan, and that the will was not destroyed so as to render the deceased intestate, but for the purpose of making way for the new means, then the law will regard the two acts as dependent upon and related to one another. Hence if the second act, through incompleteness or other defect, fails to accomplish its intended purpose, and it thereby becomes evident that the testator was misled when he destroyed his will, the principle of law under consideration regards the act of destruction as bereft of an intent of revocation and thus opens the way for the destroyed will to be admitted to probate.

■ Contestants stress the importance of *Homerton and another v. Hewitt,* 25 Law Times Reports (N. S.) 854. Homerton executed a will June 21, 1870, and died in 1871. After his death the will could not be found, although a diligent search had been made for it. A niece testified that upon the day prior to his death Homerton told her that he had left all of his property to an older brother for life, and the remainder to his other relatives. A disposition of this character had been made by a revoked codicil of March, 1867. A witness testified to a conversation with Homerton in December, 1870, in which he spoke of a bequest to a hospital by which he had been employed. The will of June 21, 1870, contained a substantial bequest to that hospital. A memorandum was discovered which purported to be a codicil to a will of July, 1870. The latter will was not found. The hospital sought the probate of the will executed June 21, 1870, and argued that Homerton's declaration in December, 1870, overcame the presumption arising from the inability to locate the will. The court held that his statement to his niece upon the day prior to his death showed that he at that time did not consider

the will in effect, and refused to admit the copy to probate. We now quote the portion of the decision upon which the contestants lay especial emphasis:

"But then it is said that if this will has been destroyed it was for the purpose of setting up the codicil, and the case therefore comes within the principle of dependent relative revocation. But the force of that is destroyed by this remark, that the court has never been in the habit of applying that doctrine to any case in which there was not proof of the destruction. It is merely a surmise of law, and we do not know when the testator destroyed it, or what he said or did when he destroyed it. It would be a dangerous thing to surmise a transaction, and build upon it some theory by which the effect of revocation could practically be destroyed".

We believe that nothing decided by the above court demands a holding adverse to the proponents. We have already pointed out that the evidence before us indicates that Mr. Flanders destroyed his will, and thereby renders the above quoted observations inappropriate to the facts before us.

Contestants rely much upon *Sanderson v. Norcross,* 242 Mass. 43 (136 N. E. 170). Norcross executed a will in October, 1913, and died in April, 1919. Upon his death the will was found in his safe with his signature, those of the witnesses, and other parts of the will obliterated. On the margin of the will he had written: "This will is void as I have made a later one. Otis L. Norcross". No later will was found, but in the abovementioned safe was an undated memorandum containing provisions very similar to the original will. It was neither signed nor witnessed. The court, after defining the doctrine of dependent relative revocation in terms very similar to the above quotations, held that the proof failed to bring the case within the doctrine. It declared: "There is nothing to show the order of events with respect to the two papers found in the safe

of the deceased''. It was altogether possible that the unsigned memorandum may have been the data which Norcross employed in the preparation of his will, executed October, 1913. The proof was silent whether the memorandum was prepared contemporaneously with the act of revocation, preceded it, or followed it. If it preceded it the doctrine clearly could not apply. *Bethell v. Moore,* 19 N. C. 311, involved facts somewhat like the Norcross case, but took a more liberal view. The evidence in the instant case quite definitely shows the order of events and also that they were parts of a comprehensive plan. It seems clear that Mr. Flanders associated in his mind the destruction of the 1929 will, the preparation of the account book, and the shipping of his intangible property to Miss White. He formed this plan when he was satisfied with the method of distribution recited in his will, but displeased with the expenses of testamentary distribution. The new method was adopted in order to save $15,000 for Miss White. Within sixty days of the time that he learned that the expenses in the probate court would aggregate $15,000 he prepared the book entries, sent the book to his niece, wrote to her: ''This takes the place of a will'', and began to send to her all of his property. It may be that the hand which tore the will did not at once take a pen and write the book entries, but it is evident that Flanders' mind associated the two details together as parts of one scheme. His act of destruction was induced by his unwarranted confidence in the book entries. His paramount intent was to prefer his nieces and nephews; his secondary purpose was to save $15,000 for Miss White. Had he known of the invalidity of his book entry scheme, we believe he would not have destroyed the will.

■■ Contestants urge that since the second instrument was not of a testamentary character the principle

of dependent relative revocation is inapplicable. We know of no reason why the rule should be shackled in such an artificial manner, and have discovered no decision which so limits it. The mistake is the important item, and not its source. *In re Southerden,* 133 L. T. R. 505, the court applied the principle of dependent relative revocation to a situation where a husband destroyed his will, misled by the mistaken belief that the statutes of descent would pass his estate to his wife in precisely the same manner as the will. The court held that the doctrine applied and admitted the will to probate. See to the same effect *In the Estate of Greenstreet,* 169 L. T. 445 (74 Sol. J. 188). For favorable comment upon these holdings, see 39 Harvard Law Rev. 405, and 5 So. Cal. Law Rev. at 407. See contra *In re Allen's Will,* 88 N. J. Eq. 291 (102 Atl. 147) ; Id., 89 N. J. Eq. 208 (103 Atl. 1051). We conclude that deceased's mistake concerning the book entries sufficed to render the doctrine applicable even though the book is nontestamentary in character. Finally, the contestants argue that since Mr. Flanders sought to evade the inheritance tax statutes his will ought not be admitted to probate. We find no merit in this argument.

It is our opinion that Mr. Flanders' act of destruction was one of dependent revocation. The animus was dependent upon the efficacy of the substituted document. His intent concerning his estate is clear.

We have carefully considered all other matters argued in the very able briefs filed on the part of the contestants. The above, however, will have to suffice as an expression of our views.

The orders and decrees of the circuit court are affirmed.

RAND, C. J., BEAN and BELT, JJ., concur.