IN RE ESTATE OF PHILIP CROSBY.
CHRISTOPHER CROSBY, APPELLANT, V. ELIZABETH JOHNSON
ET AL., APPELLEES.

FILED MARCH 23, 1934. No. 28798.

*S. L. Winters* and *J. J. Krajicek,* for appellant.

*Anson H. Bigelow, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and
PAINE, JJ., and BEGLEY, District Judge.

BEGLEY, District Judge.
One Philip Crosby departed this life at Omaha, Ne-
braska, on March 16, 1932.  After his death a diligent
search was made for a purported last will and testament
which it was claimed he executed during his lifetime.  No
will was found, but a carbon copy of a purported will,
executed before S. L. Winters, an attorney, was obtained
and filed for probate, the petition stating that the original
will had been lost, mislaid or destroyed by some one other
than the testator.  Objections were filed to the probate

thereof, and the probate court, after a hearing, duly admitted said copy to probate as a copy of the last will and testament of said deceased. An appeal was had to the district court, where objections were filed by certain heirs at law, wherein they denied that said instrument was properly executed or properly attested, and that said original, if any, was destroyed by the said Philip Crosby, with the intent to revoke the same, and that said testator was not possessed of sufficient mental capacity to make a will by reason of long-continued use of intoxicating liquors to excess. Upon a trial the jury found for the contestants and that said deceased left no last will and testament at the time of his death. From a judgment upon said verdict the proponent has appealed.

The purported will was executed on August 9, 1930, and was drawn by S. L. Winters, one of the subscribing witnesses. After executing the will, the testator retained the same in his possession, but same was not found in his possession after his death. On the trial the contestants produced a witness, Orden Anderson, who testified that he was well acquainted with Philip Crosby during his lifetime and saw him almost daily the last few weeks before his death, in fact, he was with him at the time he passed away; that about seven or eight days before he died the deceased called him in and requested that he give him a big envelope that was in the dresser drawer; that he did so, and deceased then took out a piece of white paper from the envelope and opened it and said, "This is my will. I have not treated my sisters right, so I will just destroy it." And he took and tore it into bits of paper and threw it in the slop jar that he had alongside his bed. No attempt was made to refute this testimony by any other witness and it stands uncontradicted.

The burden of proof was upon the plaintiff to prove that, during his lifetime, Philip Crosby executed a last will and testament, and that at said time he was mentally competent to do so, and that the exhibit offered in evi-

dence as such will was an exact copy thereof and that the same was not revoked by the said Philip Crosby during his lifetime. The presumption is, where a person has made a will and has retained possession of the same and after his death it is not to be found or located, that same has been destroyed or otherwise disposed of by the deceased for the purpose of revoking such instrument as his last will and testament.

In this case this presumption is supported by positive evidence of an eyewitness to the transaction that the deceased did destroy his said will with the purpose of revoking it and the verdict is supported by ample evidence.

The evidence in the trial court discloses that for many years previous to his death the testator indulged in the excessive use of intoxicating liquors and was for a time confined as a patient in St. Bernard's Hospital for chronic alcoholism. Dr. Ash, an expert in nervous diseases and in charge of deceased while a patient at said hospital, stated: "When admitted to the hospital he gave evidence of having been addicted to the use of alcohol for a prolonged period of time. The symptoms that he presented at that time suggested chronic alcoholism, and those symptoms were rather in reference to change in his intelligence, showed evidence of deterioration, also changes in his mood; he was quite irritable, and also some changes in memory, memory defects." When he was dismissed from the hospital, the doctor testified: "As far as his mental condition is concerned, it remained practically the same." The doctor's opinion as to the effect of chronic alcoholism and the mental changes described above was then asked in the following questions: "Q. What would you say, Doctor, as to his condition during that time and when he left the hospital, his mental condition, as to whether he would be in sufficient mental condition to understand reasonably his business affairs and who naturally he would have obligations to; would he be sane about matters of that kind? A. I would have to reach a

conclusion, largely,—a man in the state of chronic alcoholism, they are partially orientated as to time and place. They will lack,—in this condition they don't appreciate the deterioration that has taken place, and there is more or less indifference, irritability, fault finding, and usually following lines of least resistance; chief concern appears to be getting something to drink, and being indifferent to any other circumstance. Q. What would be your opinion as to whether he would be able to form reasonable conclusions or opinions as to matters concerning his business or his obligations to those who might have claims upon him? A. My opinion would be that he was not able to exercise good judgment in transacting business. * * * Q. Now, if we can get, Doctor, a little more definitely what your opinion is, as to whether in his condition at the time he left that hospital, and was under your treatment there, he would be in a mental condition to know and understand about his property, and what his obligations would reasonably be towards those who would have a right to have claims upon him in case he should die and his property would have to be disposed of; what would be your opinion of his ability to form sane opinions along that line? A. I would say that he would be indefinite to any circumstance of that sort."

The appellant and proponent claims error in the admission of this testimony of Dr. Ash as to the mental capacity of the deceased and his ability to transact ordinary business. In view of the showing that the will had been revoked and destroyed, said matters do not become material in this case, but we see nothing objectionable in such testimony. The doctor was testifying as to the effects of chronic alcoholism on the mental capacity of a patient and merely gave his opinion as to the ability of such person to transact business and to know and keep in mind the objects of his bounty and the persons who would have a right to expect to receive his property.

Our court has held in *In re Estate of Gunderman,* 102

Neb. 590, that an inexpert witness cannot give her opinion as to the mental capacity of testatrix unless such opinion is based solely on facts relating to the conduct and action of testatrix as detailed in the evidence of the witness, but our court has not held that an expert witness may not give his opinion as to the mental capacity of a testator, based upon mental disease, and his conduct arising therefrom.

It is held that a witness who is a competent physician or surgeon may state facts known to qualified members of his profession as to the effect, extent and tendency of professional knowledge regarding the effects of intoxicating liquors or condition of mind of a human being. 22 C. J. 543.

In *Glass v. Glass,* 127 Ia. 646, it is said: "The true mental condition of a person cannot be understood by the trier unless the degree of his capacity be in some way disclosed. And the opinion of the witness that the person was capable of transacting ordinary business, and of intelligently disposing of property, is no more than a statement of his opinion as to his real mental condition."

It is true that it takes less mental capacity to make a valid will than to make contracts, but the court properly instructed the jury as to the term "testamentary capacity."

However, we think the admission of this evidence could in no wise prejudice the rights of the proponent, as to the existence of a valid will at the time of the death of the testator.

In view of the evidence, we conclude that the judgment is the only one that could have been entered in the case, and therefore the same is

AFFIRMED.