WORCESTER BANK AND TRUST COMPANY *vs.* MARY G. ELLIS & others.

Worcester.    April 4, 1935. — September 12, 1935.

Present: CROSBY, FIELD, LUMMUS, & QUA, JJ.

*Will*, Revocation.    *Probate Court*, Appeal, Requests and rulings.

Discussion by LUMMUS, J., as to the revocation of a will.

Under G. L. (Ter. Ed.) c. 191, § 8, the maker of a will can revoke it by cancellation only by visible signs of cancellation made by him upon it with that intent.

The maker of an elaborate will disposing of a large estate, six years later crossed out in pencil the important clauses, leaving minor clauses, the attestation clause and his signature intact, and died shortly afterwards; on these facts, with evidence that he was dissatisfied with the general scheme of the will and intended to make another, the scheme of which he was considering, it was rightly found that he had revoked the will by cancellation, rather than that he had intended to leave it in force pending the execution of a new will.

The action of a judge of probate upon requests for rulings of law is immaterial upon appeal from a decree in equity.

PETITION, filed in the Probate Court for the county of Worcester on February 1, 1934, for proof of the will of Theodore T. Ellis.

The petition was heard by *F. H. Chamberlain*, J., who entered a decree disallowing the alleged will. The petitioner and the Memorial Hospital appealed. The evidence was reported.

*R. G. Dodge*, (*H. S. Davis & M. S. June* with him,) for the petitioner.

*G. H. Mirick*, *D. Whitcomb*, & *P. R. O'Connell*, for Mary G. Ellis, submitted a brief.

*T. H. Gage & W. E. Sibley*, for Memorial Hospital, submitted a brief.

*C. B. Rugg*, (*W. F. Farr* with him,) for Charles H. Ellis and another.

LUMMUS, J.    On March 24, 1927, Theodore T. Ellis executed a typewritten will, which had been drawn for him by

competent counsel. Ellis was a highly successful business man, positive, impulsive and headstrong, who had accumulated an estate of more than $2,000,000. He had a wife, Mary Gertrude Ellis, but no children. Clause 1 of the will gave his wife his household effects. Clauses 2 to 6 inclusive gave comparatively small pecuniary legacies to his "brothers" except Charles, and to various friends. Clause 7 gave to each employee of the New England Fibre Blanket Company, which Ellis controlled, $250 for each full year in its employ. Clause 8 gave $25,000 to a trustee, for his brother Charles for life, with remainder to the Trustees of the Memorial Hospital in Worcester. Clause 9 gave $25,000 to a trustee, for his sister Blanche E. Leonard for life, with a similar remainder. Clause 10 gave $10,000 to a trustee, for his cousin Alfred J. Singleton for life, with remainder to Singleton's wife and children. Clause 11 gave $10,000 to a trustee, for an aunt Sarah A. Bentley of Southport, England, for life, with remainder to the Trustees of the Memorial Hospital in Worcester. Clause 12 gave his stock in the New England Fibre Blanket Company to a trustee to sell, and pay over the proceeds to the Trustees of the Memorial Hospital in Worcester. Clause 13 gave $500,000 to a trustee, for his wife Mary Gertrude Ellis for life, with a right to use principal for her support, and with remainder to the Trustees of the Memorial Hospital in Worcester. Clause 14 gave $100,000 to a trustee, to be used for scholarships in higher schools of learning. Clause 15 gave all the residue to the Trustees of the Memorial Hospital in Worcester. By clause 16 the Worcester Bank and Trust Company was appointed executor.

On October 2, 1933, Ellis consulted the same counsel for the purpose of having a new will drawn. He said that he did not wish the Worcester Bank and Trust Company to be executor or trustee, that several legatees in the will had died; and that he wished to limit the legacies given to employees of the New England Fibre Blanket Company. He said that he wished to give his associates in that company an option to buy his stock. He said further that the liberal provision in his will for the Memorial Hospital in

Worcester had been made out of respect for a physician with whom he had since had unsatisfactory relations in a commercial venture, and that he did not intend to make any such gift to the hospital in his proposed will.

At another interview on October 17, 1933, Ellis told counsel that he had not made up his mind what to do. On October 22, 1933, Ellis brought the will of March 24, 1927, to counsel. With a lead pencil, marks had been drawn in the form of the letter X through the whole or the essential provisions of clauses 1, 2, 3, 9, 11, 12, 14 and 15, and parts of clauses 7 and 13, and single lines had been drawn through clauses 4 and 5 and the essential provisions of clauses 13 and 16. In clauses 6 and 8 a change in the amount of the legacy had been made by pencil. Neither the attestation clause, which followed closely upon clause 16, nor the signature, had been disturbed. Ellis told counsel of several changes, not theretofore mentioned, which were to be included in the proposed will.

Notwithstanding the advice of counsel at several interviews, not to leave the situation as it was "because it was leaving matters up in the air," Ellis did nothing definite about settling or executing a new will before leaving for England late in November, 1933. He died in London on January 6, 1934.

Upon a petition for the proof of the will of March 24, 1927, the Probate Court decided that it had been revoked, and disallowed it. The executor named in the will, and the Memorial Hospital of Worcester (admittedly the residuary legatee under the will), appealed.

Under our statute (G. L. [Ter. Ed.] c. 191, § 8), a will once properly executed can be revoked only by a new document executed as required for a will (*Aldrich* v. *Aldrich*, 215 Mass. 164), by change of circumstances giving rise to a revocation implied by law (*Swan* v. *Hammond*, 138 Mass. 45; *Meyerovitz* v. *Jacobovitz*, 263 Mass. 47, 50), or "by burning, tearing, cancelling or obliterating it with the intention of revoking it, by the testator himself or by a person in his presence and by his direction." The quoted words are our only concern in this case. In fact, the case

narrows down to the word "cancelling." Substantially the same language can be traced back in our statutes to Rev. Sts. (1836) c. 62, § 9, St. 1783, c. 24, § 2, and St. 1692–3, c. 15, § 4. The last cited section formed part of the statute of frauds, and was copied from the English statute of frauds, 29 Car. II, c. 3, § 6. By the Wills Act of 1837, 7 Will. IV & 1 Vict. c. 26, § 20, cancellation ceased to be a legal mode of revocation in England, although a will might still be revoked by "burning, tearing, or otherwise destroying the same by the Testator, or by some Person in his Presence and by his Direction, with the Intention of revoking the same." *Stephens* v. *Taprell*, 2 Curt. Eccl. 458.

The material principles of law are settled. "Revocation is an act of the mind, which must be demonstrated by some outward and visible sign or symbol of revocation. The statute has specified four of these; and if these or any of them are performed in the slightest manner, this, joined with the declared intent, will be a good revocation." *Bibb* v. *Thomas*, 2 Wm. Bl. 1043, 1044. But the intent need not be declared. That it exists is enough. The intent to revoke, and the doing of one of the acts required by the statute, must both exist at the same moment. *Cheese* v. *Lovejoy*, 2 P. D. 251. *Elms* v. *Elms*, 1 Sw. & Tr. 155. *Brunt* v. *Brunt*, L. R. 3 P. & D. 37. *Gill* v. *Gill*, [1909] P. 157. *Frothingham's Case*, 6 Buch. 331. *Clingan* v. *Mitcheltree*, 31 Penn. St. 25. *Safe Deposit & Trust Co. of Baltimore* v. *Thom*, 117 Md. 154, 164, 165. *Sellards* v. *Kirby*, 82 Kans. 291. 62 Am. L. R. 1367. See also *Fleming* v. *Morrison*, 187 Mass. 120, 123. Cancellation is not restricted to its etymological meaning of covering with marks in the form of latticework or crosses. *Bigelow* v. *Gillott*, 123 Mass. 102, 106. *Estate of Olmstead*, 122 Cal. 224, 230. Some decisions have extended it to any words or marks upon the will that indicate an intent to revoke, although such words or marks do not touch the original words of the will. *Warner* v. *Warner's Estate*, 37 Vt. 356. *Evans's Appeal*, 58 Penn. St. 238. But the prevailing rule requires some defacement or mutilation of the words of the will. *Sanderson* v. *Norcross*, 242 Mass. 43, 45. *Thompson* v.

*Royall*, 163 Va. 492. There is no legal distinction between cancellation by ink and cancellation by lead pencil, although the use of the latter may be considered for what it is worth upon the question of fact whether revocation was intended. *Meredith* v. *Meredith*, 35 Del. 35, and cases cited. A part of a will may be cancelled, leaving the rest in full force. *Bigelow* v. *Gillott*, 123 Mass. 102. The burden of proof is on the party contending that a will has been revoked. *Giles* v. *Giles*, 204 Mass. 383, 385. *Aldrich* v. *Aldrich*, 215 Mass. 164, 171.

No question arises here as to the sufficiency of the marks of cancellation. They were plainly sufficient. The handing of the will, so marked, by Ellis to counsel, to say nothing of his statement to counsel (G. L. [Ter. Ed.] c. 233, § 65), warrants the conclusion that Ellis made the marks, fully as much as would the finding of the will so marked among his effects at his death. 62 Am. L. R. 1372. No question is raised as to the admissibility of declarations of Ellis to show his intention in making those marks. *Pickens* v. *Davis*, 134 Mass. 252, 257, 258. *Aldrich* v. *Aldrich*, 215 Mass. 164, 170. *Mahan* v. *Perkins*, 274 Mass. 176, 179. *Crosby* v. *Mutual Benefit Life Ins. Co.* 221 Mass. 461, 464. Wigmore, Evidence (2d ed.) § 1737. Neither has it been argued that, if there was a revocation, it was limited to part of the will. The clauses marked out comprise the main provisions of the will, including the residuary clause. It is inconceivable that Ellis intended to preserve the minor clauses not actually crossed out, and to have them stand as his whole will. *Leonard* v. *Leonard*, [1902] P. 243. *Henry* v. *Fraser*, 58 App. D. C. 260, 29 Fed. Rep. (2d) 633, 62 Am. L. R. 1364. *Dammann* v. *Dammann*, 28 Atl. (Md.) 408. We have no occasion to consider the doctrine of conditional revocation or dependent relative revocation (33 Harv. Law Rev. 337; 68 C. J. 799; 62 Am. L. R. 1401), for Ellis acted under no mistake and never believed that he had made any new testamentary disposition. *Sanderson* v. *Norcross*, 242 Mass. 43. *Townshend* v. *Howard*, 86 Maine, 285, 290. *In re Bonkowski's Estate*, 266 Mich. 112. *Flan-*

*ders* v. *White,* 142 Ore. 375. *In re Estate of Nelson,* 183 Minn. 295, 298.

The real question before us is one of fact. *Trade Mutual Liability Ins. Co.* v. *Peters,* 291 Mass. 79, 83–84. That question is, whether Ellis, when he made the cancellation upon the will, had an intent finally to revoke it, or had a merely "deliberative" intent to leave the will in full force until a new will should be executed with variant provisions of which the marks on the will furnished some indication. *Clarke* v. *Scripps,* 2 Rob. Eccl. 563. *Bohanon* v. *Walcot,* 1 How. (Miss.) 336. *Frothingham's Case,* 6 Buch. 331, 333. *Lord's Appeal,* 106 Maine, 51, 58. *Safe Deposit & Trust Co. of Baltimore* v. *Thom,* 117 Md. 154.

Considerations of substance are urged upon us as tending to show that Ellis probably would have preferred a distribution of his property under the will of March 24, 1927, to dying intestate. Although that will was unsatisfactory, its provisions in many respects came nearer to what he had in mind for a new will than did the consequences of intestacy. He never intended to give his brothers by will the fortune that will be theirs if the will falls. He did intend to remember by will various persons who will get nothing if the will is not allowed. He never told counsel in terms, nor did counsel advise him, that the will was revoked and that if he should die he would die intestate. Counsel did tell him that he "was leaving matters up in the air," that "he had left things so that no one would know what he wanted to do with his property, unless he got around to make a new will," and gave him the impression that leaving things as they were "was sure to provoke litigation." It is argued that the statement made with an oath by Ellis during one of the discussions with counsel, "if anything happens to me, let the law administer my property!", was an impulsive expression of his emotion of the moment that indicated nothing as to his intention at the earlier and vitally important time when he was making the cancellation on the will.

But the considerations to the contrary seem to us stronger.

Even though the will in some ways was nearer to his purpose than was intestacy, it was very unsatisfactory. The residuary legatee was to receive under the will much more than Ellis was willing to give. A careful weighing of the advantages and disadvantages of present revocation was apparently foreign to his nature. When he first brought the will to counsel he said that he "had been all over it"; that "there was substantially nothing in it that was satisfactory to him"; that "he crossed out substantially all the provisions"; that he "was going to tear up this document but . . . thought" counsel "might like to use it as a chalk" in drawing certain parts of a new will. At that very interview, when pressed by counsel to make up his mind as to the provisions of a new will, he said that "he would rather die without a will than to leave that damned instrument." We agree with the conclusion of the Probate Court, which in a case of this character is itself entitled to some weight (*Trade Mutual Liability Ins. Co.* v. *Peters,* 291 Mass. 79, 84), that the cancellation was made by Ellis "with the intention of revoking" the will.

Although this case comes up by appeal under equity practice (*Boston Safe Deposit & Trust Co.* v. *Wickham,* 254 Mass. 471, 473), the petitioner argues that there was reversible error in the refusal of the judge to give its requests for rulings numbered 9 and 10, which read as follows: "9. If when the testator made the marks on his will he was not aware of the fact that a will could be revoked by cancellation, the will must stand. 10. The fact that the testator could so easily have made his intention manifest if he intended absolute revocation of the will, as for example by cutting out or crossing out his signature, or by some writing on the will, furnishes a strong indication that he did not intend absolute revocation." The former request is not the law. Knowledge of law is not essential to revocation. The latter request selects for emphasis one fact out of many bearing on the intent. *Commonwealth* v. *Polian,* 288 Mass. 494, 499. But the short answer is, that in a case coming up by appeal under equity practice, requests for rulings commonly have no technical standing, and a

failure to grant them or to deal with them is not ground for reversal of the decree. *Estey* v. *Gardner*, 291 Mass. 303, 307–308. See also *Zuckernik* v. *Jordan Marsh Co.* 290 Mass. 151, 157–158.

*Decree affirmed.*