Argued December 12, 1956, affirmed February 27, 1957

## In re Estate of Francis P. Salter, Deceased
## SALTER *v.* SALTER, Administrator

307 P. 2d 515

*Noreen Kelly,* of Medford, argued the cause for appellant. On the brief was Edward C. Kelly, of Medford.

*Walter D. Nunley,* of Medford, filed a brief for respondent.

Before WARNER*, Chief Justice, and TOOZE**, LUSK and BRAND, Justices.

BRAND, J.

Francis P. Salter died in the Oregon State Hospital at Salem on 19 February 1952 at the age of 82. He was survived by Hattie Salter, his widow, the petitioner herein, and by R. E. Salter, his son by a previous marriage, now the contestant. On 20 March 1952 the contestant filed a petition for appointment as administrator of the decedent's estate, alleging that diligent search had been made among the effects of the decedent and that decedent left no will. On 24 March 1952 the contestant was appointed administrator and he qualified as such. On 10 June 1954 Hattie Salter filed a petition for revocation of the letters of administration and for the probate of a lost will, an unsigned purported office copy of which was presented with the petition. Citation was served on the administrator and the cause was tried. On 16 July 1954 the court entered an order dismissing the petition, and Hattie Salter appeals. The petition for probate of will was in part, as follows:

"That as more particularly appears from the affidavits of Kenneth G. Denman, Hattie Salter and

* Chief Justice when this case was argued.
** Died December 21, 1956.

Charlotte Haukli, attached hereto and by this reference made a part hereof, your petitioner has ascertained that on or about April 29, 1943, Kenneth G. Denman, a duly licensed, admitted and practicing attorney in the City of Medford, Jackson County, Oregon, was contacted by said Francis P. Salter, relative to the drawing of a Will for said Francis Philip Salter, and that on April 29, 1943, said Kenneth G. Denman drew a Last Will and Testament, and that to the best of the knowledge and recollection of said Kenneth G. Denman, said Will was signed by said Francis Philip Salter and witnessed by said Kenneth G. Denman and his stenographer, Doris Cator, and said Francis Philip Salter took said Will with him when he left the office of Kenneth G. Denman on April 29, 1943. That your petitioner has not been able to locate or find the original of said Will signed by said Testator and witnessed by said witnesses aforesaid; that prior to his death, said Francis Philip Salter informed your petitioner that he had made a Will which was in his safety deposit box in the Medford Branch of the United States National Bank of Portland at Medford, Oregon. That your petitioner knows that prior to the death of said Francis P. Salter, said R. E. Salter had access to the safety deposit box of said decedent and is informed and believes and, therefore, states that said Will has been or is in the possession of said R. E. Salter."

It is also alleged that "said Will has either been lost or destroyed or is in the possession of said R. E. Salter." The remaining allegations of the petition consist of the recital of evidentiary matter on which the petitioner relies as indicating the existence of a will at the time of her husband's death. The only heirs at law are the widow and son. The parties, on the basis of Mr. Denman's affidavit, stipulated as follows:

"* * * that the statements in the affidavit attached to the petition of Kenneth G. Denman are

correct and may be considered as having been testified to by Mr. Denman under oath if called as a witness in this proceeding; that Mr. Denman was on April 29, 1943, has been since that time and is now a duly licensed, qualified and practicing attorney within the state of Oregon, practicing in the city of Medford, and within Jackson county, Oregon; that on or about April 29, 1943, Mr. Denman maintained an office in the Brophy Building in Medford, Oregon, and that on or about that date he was consulted by the decedent, Francis Philip Salter, also known as Francis P. Salter and Frank Salter, with reference to the drawing of a last will and testament for Mr. Salter; that on or about April 29, 1943, Mr. Denman prepared a last will and testament for Mr. Salter, and that on that date Mr. Salter paid him a fee of ten dollars for preparing a last will and testament; that to the best of Mr. Denman's knowledge, recollection and belief the will was signed by the decedent Francis P. Salter on that day, namely, April 29, 1943, and that the will was witnessed by Mr. Denman and by his then secretary, Doris Cator, and that to the best of Mr. Denman's knowledge, recollection and belief at that time Mr. Salter took the executed and witnessed will with him when he left Mr. Denman's office on April 29, 1943; that Petitioner's Exhibit '1' marked for identification is Mr. Denman's office copy of the will which, to the best of Mr. Denman's knowledge, recollection and belief was duly executed and witnessed as hereinbefore stipulated; that the notations which appear on the office copy, Petitioner's Exhibit '1' marked for identification, are in the handwriting of Mr. Denman's former secretary, but that Mr. Denman has no recollection of the occasion or reason for the notations made on the office copy by the secretary, and that Petitioner's Exhibit '1', which is Mr. Denman's office copy of the last will and testament of Francis Philip Salter, has remained in Mr. Denman's possession up to the time of this proceeding, and has been produced by him

for identification and admission in evidence in this hearing, and that petitioner's Exhibit '1' may be admitted in evidence.''

The office copy which was not signed by either the decedent or the witnesses was introduced in evidence as Exhibit 1. It is the usual form for a will, and provides for the payment of debts and funeral expenses, bequeathes an automobile to testator's wife and confirms the gift of a diamond ring to her. The instrument is typewritten. The paragraph numbered ''THIRD'' contains numerous excisions, alterations and additions in hand writing with pen and ink. We shall set that paragraph forth below. Where an ink line is drawn through any typed words, we have typed a line through those words. Where typed words were thus stricken, and changes were made in ink, we have typed those changes in italics over the portions stricken. The hand-written portions added to the typed portions but not substituted for stricken portions are also placed in italics. With this explanation, we set forth the paragraph and the alterations and additions, as follows:

''*THIRD*: I give, devise and bequeath unto my said wife, Hattie I. Salter, all of the following described land located in Jackson County, Oregon, to-wit:

*West*

''Commencing 10 rods ~~South~~ of the Northeast corner of the Northwest Quarter of the Northeast Quarter of Section 32 in Township 32 South of Range 3 East of the Willamette Meridian in Jackson County, Oregon, thence South 24½ rods, thence *W* *6½* *N* *24½* *E* ~~East~~ 24½ rods, thence ~~West~~ *6½* rods, thence ~~North~~ *6½* ~~24½~~ rods, ~~thence East 6½ rods~~ to the place of be-

ginning, *together with 4 houses and other buildings located thereon & water rights appurtenant* and in connection therewith, I give and bequeath all household furniture, fixtures and household equipment in

    *4*         *located on the*

the   houses ~~occupied~~ ~~as~~ ~~my~~ ~~home~~ ~~on~~ said real property unto my said wife, Hattie I. Salter.''

The residue of the estate was devised and bequeathed to the testator's son, R. E. Salter, who was appointed executor to serve without bond.

Before considering the evidence we will review the allegations of the petition concerning the testator's son. It is stated therein that R. E. Salter, in his petition for letters of administration, alleged that the decedent died intestate. In fact, the petition for letters of administration recites ''due and diligent search'' for a will, which statement is followed by the conclusion that the decedent died intestate. Petitioner Hattie Salter alleges that she ''knows that prior to the death of said Francis P. Salter, said R. E. Salter had access to the safety deposit box of said decedent * * *.'' She alleges further that the testator complained that R. E. Salter had not sent to him the key to the safety box and that the son was having a duplicate made which he would mail to the testator. Finally she alleges that the will ''has either been lost or destroyed or is in the possession of said R. E. Salter.'' The foregoing constitutes all of the allegations connecting R. E. Salter with the transaction. While by inuendo she hints at misconduct by the son, petitioner's final charge amounts to no more than that the will is either lost or destroyed (without specifying whether it was destroyed by the testator or by the son) or is in possession of the son. Some care appears to have been taken

to avoid any direct charge that the son wrongfully destroyed his father's will.

Much of the testimony of petitioner is devoted to the proof that Francis P. Salter made a will. The stipulation of the parties sufficiently establishes that fact. The only question is whether he destroyed it himself or some one else wrongfully destroyed it.

■ The petitioner's first contention is highly technical. Upon the filing of the petition for probate of a lost will, a citation issued to the administrator, R. E. Salter, directing him to appear and show cause why the alleged will should not be admitted to probate. The petition was accompanied by affidavits. The contestant filed no pleading or affidavits in opposition to the petition but appeared personally and testfied in opposition thereto. Petitioner makes the contention that since R. E. Salter did not controvert the petition "by any *affidavit* or other *appearance filed of record*" (italics ours), but merely testified in open court, the petition must be deemed to be true and the court should have admitted the will to probate without taking evidence.

This case bears no resemblance to the situation which arises when a plaintiff files a complaint, the defendant fails to appear and a default judgment is entered. Wills cannot be admitted to probate without proof. ORS 115.140. It is provided that no particular pleadings or forms thereof are required in the exercise of jurisdiction of probate courts. ORS 115.010. The additional provision in the same section that "the proceedings must be in writing and upon the petition of a party in interest or the order of the court" requires the initiation of probate proceedings by a writing, but does not require the filing of a written and sworn answer by an administrator who, as in this case, was cited by the probate court to appear and show cause.

The case was presented by sworn testimony pro and con and also on a stipulation of facts, some of which supported and others opposed, the case of the petitioner. The cause was tried on the merits and no objection was made at the opening of the trial or, so far as we can discover, at any other time, until the filing of the brief in the Supreme Court. We reject the contention.

Turning to the office copy of the will we first consider the pen and ink changes which appear thereon. It is stipulated that the testator executed a will of 29 April 1943, but neither the stipulation, nor the affidavit of attorney Denman on which it was based, indicates whether the original will was signed as originally typed, or as appears in the copy as altered in pen and ink. Those alterations which appear on the office copy "are in the handwriting of Mr. Denman's former secretary" but "Mr. Denman has no recollection of the occasion or reason for the notations made on the office copy." The secretary did not testify nor did anyone else inform the court as to the time when the "notations" were made or by whose authority. It is highly improbable that the original will was in the same condition as the copy as to alterations. We are therefore left to speculate as to whether the will which was signed conformed to the typing on the copy or to the copy as altered, or whether the secretary's notations on the copy were made after the will was signed and were preparatory to the making of a new will. If the hand-written changes were made after the will was executed we would assume, in the absence of evidence, that they were made at the request of the testator preparatory to the making of a new will. We observe one other peculiar feature of the office copy, which may or may not have significance. The entire instru-

ment appears to be a carbon copy, with one exception. The words "WITNESS my hand and seal this 29th day of April, 1943." clearly appears to be a typing of first impression. The stipulation shows that when the will was executed the testator took it with him. The only evidence that the will was placed in the safety deposit box appears in the testimony of petitioner concerning a conversation with the testator. We quote:

"Q When, to the best of your recollection, did Mr. Salter first say anything to you about having made a will?

"A About a year and six months, or a year before he was taken ill and then had to be taken away.

"Q Where was this statement made, and what were the circumstances?

"A It was in our own home, and we had talked about it before, but the last time he talked about it he said he had—he was sitting there in the house, and he said to me 'I wish Dick would hurry up and send me my key.' I said 'What key?', and he said 'He has the key to my lock box.' I said 'What's he doing with your key?', and he said 'Well, I lost or broke mine', and he said he was having a new one made; and that was the last time he talked about it. I said 'you shouldn't be letting everyone have your key, because you will lose something, and then you would be wondering why.' He said 'Nobody ever goes in my lock box, because all my private papers, my will and deeds are in this lock box', and then he talked about the key, and he said 'Well, you don't need to worry, you will be taken care of.' Before that, he had talked about that place up there, and he said he had given the place down here that had belonged to him, he gave that to Dick. He said 'This place is mine to do what I please with it.' "

At another point petitioner testified that the date of the conversation about the key and safety box was:

"A  Oh, I don't know—along about August or September, * * *.

"Q  Which year was that?

"A  1950."

Petitioner testified that her husband became ill in November or December with "some kind of kidney disease", but she testified further, as follows:

"Q  Well, at what time did his mind seem to become affected from his illness?

"A  Well, he was all right, only just whenever these spells would come on him, it seemed to affect him. He would wander around, then he would get over it and get better, but he kept getting thinner."

Again we quote:

"Q  Do you have any knowledge as to any person having access to that safety deposit box during the year 1950, other than your husband Francis Salter?

"A  No."

Petitioner testified that the employee at the bank said that R. E. Salter "had been in the box".

Witness Charlotte Haukli testified to a conversation with the testator in the year 1944, when he said that he did not want to sell a certain lot "because he had his will made, and if he sold it he would have to change his will." She added that the testator did sell the lot some time between 1946 and 1948.

The only witness beside the petitioner and Mrs. Haukli was R. E. Salter, the contestant. Called as an adverse witness he testified that prior to his father's admittance to the hospital he had accompanied his father to the bank on four or five occasions. He went at his father's request. The latter had made arrange-

ments with the bank employee for the signature of both father and son on the card. On one occasion R. E. Salter went to the bank alone and got from the safety box a deed to some property which he had bought from his father. He knew that a will had been made because his father had told him in 1949 that he intended to make changes, "that he hadn't liked the arrangements too well * * *." He testified that he searched for a will but didn't find one. He also said that his father, prior to the insanity matter, asked him to find an attorney to represent him in "connection with changes he wanted to make in his property." The son talked with attorney Frohnmayer and his father "came down with the intention of meeting Mr. Frohnmayer" but had an automobile accident and so didn't do it. R. E. Salter testified positively that he never saw any will that had been executed by his father. He went to the safety box alone only once. On that occasion he went at his father's request and was given the key by his father. Salter also testified concerning his father's relationship to the petitioner, as follows:

"Q When was the first time your father indicated a dissatisfaction with the way he had arranged for his property to be disposed of?

"A It was along in 1949, I imagine.

"Q What did he say? Did he give you any reason for it?

"A He seemed to think things weren't going too well at home, and he wanted to be sure his property was divided the way he wanted it to be. He wanted to make some changes.

"Q What did he say about the way things were going at home? Was he specific?

"A He was quite emphatic about the way things were going. They were very unsatisfactory.

"Q In what way?

"A Well, he seemed to think he wasn't being taken care of at home, or getting his meals on time. Mrs. Salter wasn't home to be company to him or help look after him and be company to him like she should have been.

"Q Was he brought down to your house at any time by Mrs. Salter and/or her son Louis Biden, and left with you?

"A He was brought down by Mrs. Biden. Mrs. Hattie Salter set out on our parking, * * *.

* * * * *

"Q What was his condition at the time he was brought and set down on your parking?

"A He was sick, and he needed some care, and he needed food.

"Q In what way did he need care?

"A His clothes were dirty, and he needed to be cleaned up.

"Q In what fashion?

"A Well, he was just generally unkempt and needed cleaning, * * *."

Petitioner admitted that the testator was "a little hard to get along with." The petitioner is the contestant's stepmother.

The evidence is not wholly clear on either side, but from the testimony taken as a whole, we find that the condition of the office copy casts doubt as to the provisions which were incorporated in the original. It also tends to indicate that the testator was not satisfied with the will as typed and desired that changes be made, either before or after execution. The relationship between testator and his son appears wholly normal. The relationship between testator and his wife was strained and caused dissatisfaction in the testator's mind. There is evidence that the testator took the

executed will with him, and some indication that it was in the safety box, and there is clear evidence that it was not found after testator's death. There is substantial evidence of an intent by the testator to change his will. There is no evidence that the son ever saw the will or ever destroyed it.

We now turn to the rules of law which serve as guides to decisions in dealing with the evidence.

The issue in this case is as follows: When a will is duly executed and is shown to have been in the possession and control of the testator but cannot with due diligence be found upon his death, was it in existence and unrevoked when he died? Under the statute a will is revoked if it is "burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by another person, in his presence, by his direction and consent; * * *." ORS 114.110. Examination of the authorities discloses conflict and confusion as to the true burden of proof upon the issue thus stated. As stated by Wigmore, "Whether this circumstance [that the will cannot be found], with or without others, should create a rule of presumption, or of sufficiency of evidence, has been much debated." IX Wigmore on Evidence, Third Ed, § 2523, p 439. By the true burden of proof we mean the burden which is on the party who is subject to the risk of nonpersuasion who must lose unless he produces a preponderance of evidence in his favor.

■ The confusion found in the authorities arises from a failure to distinguish between a true burden of proof, on the one hand, and a duty to go forward with the evidence and rebut a presumption of revocation, on the other. It is uniformly held that when a will which

has been shown to have been executed and in the possession of the testator cannot be found, a presumption, sometimes called an inference, arises that the testator revoked his will. The presumption is rebuttable. But such presumption must be overcome by evidence of the proponent or the will is not entitled to probate. The editors of American Law Reports state the rule as follows:

> "While the rule is uniform that the failure to find a will which was duly executed and was in the possession of, or readily accessible to, the testator, or a will which was not shown to have been in the custody of another at the time of its loss, raises a presumption that he revoked it, the great weight of authority is to the effect that such presumption is not conclusive and so may be overcome by sufficient evidence, the point being made in some cases that the burden of proof of nonrevocation is on the proponent of the will." 3 ALR2d 952, § 3.

Among many cases cited by the editors in support of the rule, a considerable number appear to go no further than to say that in view of the presumption favoring revocation, the proponent of a lost will must go forward with the evidence if he would prevail. But there is weighty authority for a more stringent rule. It has been held that proof of the existence of a lost or a destroyed will must be strong and conclusive and that proof by a mere preponderance is not sufficient. *Blalock v. Riddick,* 186 Va 284, 42 SE2d 292; *Coghlin v. White,* 273 Mass 53, 172 NE 786.

In the following cases the court recognized the presumption, but went further and indicated that the proponent is not merely required to go forward with the evidence or lose, but that a true burden of proof rests upon him in the first place.

*In re Crosby's Estate,* 126 Neb 509, 253 NW 652, 653, the court said:

"The burden of proof was upon the plaintiff to prove that, during his lifetime, Philip Crosby executed a last will and testament, and that at said time he was mentally competent to do so, and that the exhibit offered in evidence as such will was an exact copy thereof, and that the same was not revoked by the said Philip Crosby during his lifetime. * * *"

See also, *In re Flood's Estate,* 47 Cal2d 809, 119 P2d 168; *Caudill v. Loar,* 293 Ky 223, 168 SW2d 757, 758; *Moore v. Williams,* 30 Tenn App 479, 207 SW2d 590 (the proponent must show to the satisfaction of the court that the will had not been revoked); *Webb v. Lohnes,* 101 F2d 242 (the proponent must show by a preponderance of the evidence that the lost will was not destroyed by the testatrix with the intention of revoking it); *Koester v. Jennings,* 334 Ill 107, 165 NE 650; *Goodale v. Murray,* 227 Iowa 843, 289 NW 450; *In re Eder's Estate,* 94 Colo 173, 29 P2d 631. It is also held that a presumption of revocation arises when a will which was in the possession of the testator cannot be found, even though persons interested in establishing intestacy may have had opportunity to destroy the will. *Moore v. Williams,* supra; *In re Beckerle's Will,* 46 NYS2d 271. See also, 95 CJS 278, Wills, § 384(c); 57 Am Jur 636, Wills, § 973.

Our statutes provide:

"The party having the affirmative of the issue shall produce the evidence to prove it. Therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side." ORS 41.210.

"Each party shall prove his own affirmative allegations. * * *" ORS 41.240.

■ The petition herein is stated in affirmative form. i.e., that the will evidenced by the copy was and is the last will and testament of Francis Phillip Salter, now deceased. There being no pleading by the contestant it would appear that under our statutes and in the light of the decisions, the burden would rest upon the petitioner to prove that the will was in existence when the testator died.

> "It must, we think, be taken for granted, therefore, that the will when last seen was in the custody of the testator, and since it could not be found after his death a legal presumption is raised that it was destroyed by him with the intention of revoking it, and the burden of proof is on the proponent to overcome this presumption: * * *
>
> * * * * *
>
> "* * * but it is sufficient to say that in our opinion the presumption, which the law attaches to the fact that the will cannot be found, has not been overcome by proponent." *McCoy's Will,* 49 Or 579, 581, 583, 90 P 1105, 1106.

In any event, it is clear from the evidence that a disputable presumption of revocation arose by reason of the fact that the will was shown to have been in the possession of the testator but could not be found after diligent search upon his death. The presumption in this case is supported by evidence and is firmly established by the decisions of this court. *Flanders v. White,* 142 Or 375, 18 P2d 823; *In re Carlson's Estate,* 153 Or 327, 56 P2d 347; *Van Vlack et al. v. Van Vlack,* 181 Or 646 at 657-8, 182 P2d 969, 185 P2d 575; *In re Estate of Charles J. Petersen,* 202 Or 4, 271 P2d 658.

The contestant relies heavily upon Miller's Will, 49 Or 452, 90 P 1002. That case is clearly distinguishable. The will was shown to have been placed in the

custody of a third person. The presumption of revocation did not arise in that case.

In addition to the evidence, presumptive and otherwise, tending to show revocation, we have serious doubt as to whether the evidence established with sufficient certainty the provisions of the will which was executed by the testator.

■ Finally, it is uniformly recognized that in cases of this kind the decision of the trial court who heard the testimony is entitled to great weight. An opinion was written by the trial judge in this case, in which he ably analyzed the facts and the relevant law. The judgment of the lower court is affirmed.