[No. 28331. Department One. May 8, 1942.]

*In the Matter of the Estate of* LOTHAIRE KERCKHOF,
*Deceased.*

LOUIS KERCKHOF, *Appellant,* v. JOHN HORRIGAN, *as*
*Guardian ad Litem, et al., Respondents.*[1]

*Richard S. Munter* and *Cameron Sherwood,* for appellant.

*Horrigan & Horrigan,* for respondent Horrigan.

[1]Reported in 125 P. (2d) 284.

DRIVER, J.—On March 28, 1940, Lothaire Kerckhof was in a hospital in Pasco and about to undergo a surgical operation for a ruptured gastric ulcer. He indicated to the attending physician that he wanted to make a will, leaving five thousand dollars to his housekeeper and fiancee and the rest of his property to his brother Louis. A nurse was summoned and, under the direction of the patient, she wrote out substantially the following:

"I, Lothaire Kerckhof, in settlement of my estate, will $5,000 to my fiancee, Betty Weily; the balance of my estate to go to Louis Kerckhof, my brother."

Mr. Kerckhof then signed the writing, and two nurses and Miss Weily signed it as witnesses. On April 1st, after the operation had been performed and the patient apparently had an excellent chance of recovery, Miss Weily took the will to a Pasco attorney to get an opinion as to its validity. Later the same day, she asked him to come to the hospital, and, there, Mr. Kerckhof informed him that he wanted to give Miss Weily a check for five thousand dollars in lieu of the bequest in the will, and that he desired all the rest of his estate to go to his brother Louis. As to what then transpired, we quote from the attorney's testimony at the hearing on the petition to probate the will, as follows:

"A. I suggested to Mr. Kerckhof that we prepare a new will providing that all his estate should go to his brother, Louis. He asked why that was necessary and I told him I would have to have further facts before I could advise him whether a will would be necessary. I asked whether his father and mother were living and he said no, they were not. I asked if he had any brothers and sisters other than Louis, and he said, 'No, I have not.' I asked him whether there were any children of possible deceased brothers and sisters, and he said 'No.' And so finally I asked, 'You have no children?' and he said, 'No, I have no children.'

"I said, 'Are there any other relations?' and he said, 'No.' So I told him under the circumstances, since there were no other relatives other than Louis, that Louis was his only heir and it wouldn't be necessary to draw a will because of the fact that his brother would inherit the entire estate. I said, 'If you don't feel up to making a will, just better leave things as they are.' I then suggested to him inasmuch as this will contained a bequest of $5,000 and that there might be a possibility of her claiming another $5,000—he had made it very evident that $5,000 was all he wished her to have; he wanted his brother to have the balance—I suggested under the circumstances the best thing to do was to destroy the will. I asked him to direct me to destroy it by tearing it, and he did that. I tore it up and deposited it in the waste-basket."

On cross-examination, the attorney testified:

"Q. And then just what was said to lead up—I know you have gone thoroughly into the question of other heirs—but to lead up to the destruction of the will? What purpose, if any, did he express? A. He didn't express any purpose. I just merely told him that in view of the fact that there was this possibility of her claiming another $5,000, and his expression to me that that was all he wanted her to have and that he wanted the brother Louis to inherit the balance of the estate, he had better direct me to destroy the will. What he was trying to get at was to avoid any possibility of her receiving another $5,000. Q. And which he did order you to destroy and you did destroy it? A. Yes. Q. There was nothing said on his part to indicate that you were only to partially destroy the will? A. No. Q. It was clearly a command to destroy the will? A. He said, 'Go ahead,' so I tore it in three pieces."

On April 2nd, Miss Weily cashed the five thousand dollar check and disappeared. Lothaire Kerckhof developed post-operative peritonitis and died on April 4th.

As a matter of fact, his brother Louis was not his only living relative. He had a number of brothers and

sisters residing in Belgium, but it is not definitely known how many of them survived him. He had not communicated with any of them for about nine years, and it has not been possible to get in touch with them since his death because of war conditions. Louis has resided in Walla Walla county for many years, and his relations with the decedent had been intimate and very friendly.

Louis Kerckhof petitioned for the probate of the destroyed will. A hearing before the court resulted in an order denying admission of the will to probate and appointing an administrator. The petitioner appealed. The respondents are the administrator and a guardian *ad litem* appointed for any of the European heirs who may be under legal disability.

Rem. Rev. Stat., § 1398 [P. C. § 10025], reads:

"No will in writing, except in cases hereinafter mentioned, nor any part thereof, shall be revoked except by a subsequent will in writing, or by burning, canceling, tearing, or obliterating the same, by the testator or testatrix, or in his or her presence, by his or her consent or direction."

■ It can readily be seen that a strict and literal application of the statute would impel the conclusion that the will of Lothaire Kerckhof was revoked. It was torn up and destroyed in the presence of the testator with his consent and at his direction. It is appellant's contention, however, that the will was not effectually revoked for the reason that, under the circumstances, the doctrine of dependent relative revocation applies. A widely accepted and frequently quoted definition of the doctrine appears in an annotation in 62 A. L. R. 1367, subd. VII, 1401, and is reiterated in a later supplemental annotation, 115 A. L. R. 710, 721:

"When a will, or portions thereof, are canceled or mutilated in order to change the will in whole or in part, and the attempt fails for want of due authentica-

tion, or other cause, this effort to revoke in whole or in part will be treated as relative and dependent upon the efficacy of the new disposition intended to be substituted; and hence, if the attempted disposition is inoperative, the revocation fails also, and the original will remains in force. This rule is styled the doctrine of dependent relative revocation. It is based upon the presumption that the testator performed the act of revocation with a view and for the purpose of making some other disposition of his property in place of that which was canceled, and that there is, therefore, no reason to suppose that he would have made the change if he had been aware that it would have been wholly futile, but that his wishes with regard to his property, as expressed in his original will, would have remained unchanged, in the absence of any known and sufficient reason for changing them."

The rule, it will be noted, is essentially one of presumed intention. The courts, apparently out of a desire to give effect to the intention of the testator, have presumed that he would have preferred the will which he had canceled or mutilated to the intestacy brought about by the unforeseen thwarting of the attempted later alternative disposition.

Very briefly, the rationale of the doctrine is this: To effect the revocation of a will, two elements are essential, an overt act and *animus revocandi*; and there can be no real intention to revoke when the act of destruction or cancellation is induced and motivated by a mental misconception of the effect of the act on account of ignorance, or mistake, or some other error. The doctrine has been a fruitful source of controversy both in and out of the courts, and there is a wealth of expository material available. See articles in 2 Va. L. Rev. 327; 22 Harv. L. Rev. 374; 33 Harv. L. Rev. 337; 23 Ky. L. Jour. 559; 50 Yale L. Jour. 518; 5 So. Cal. L. Rev. 273, 398. The cases are extensively reviewed in the two A. L. R. annotations above mentioned.

In the present case, the testator did not destroy his will because he intended to make, or had attempted to make, another one. It was his deliberate purpose to refrain from making any alternative testamentary disposition of his property, but that purpose was based upon a misunderstanding of the effect of the law of descent and distribution in his situation, or in what he apparently conceived his situation to be.

An English court has applied the doctrine of dependent relative revocation to just such a state of facts in *In re Southerden*, 133 (N. S.) Law Times Reports, 505. A will provided that the testator's wife should take all of his property. Acting upon the erroneous assumption that it would all go to her anyway if he died intestate, the testator destroyed the will by burning it. The English court of appeal held that there had been no valid revocation for the reason that the requisite intention to revoke was wanting, and that the executors of the will were entitled to a grant of probate.

However, appellant has cited no decision of an American court that has gone so far. The nearest approach to it probably is *Flanders v. White*, 142 Ore. 375, 18 P. (2d) 823, decided by the supreme court of Oregon in 1933. There, the testator had been informed that it would cost more than fifteen thousand dollars to probate and administer his estate under his will. In an effort to save that expense, he converted his estate into intangible personal property and turned it over to a favorite niece. Later, he sent her an account book in which he had inscribed entries and instructions providing for the disposition of his property upon his death. After his decease, the will could not be found, and the circumstances were such as to indicate that he had destroyed it. The court held that, under the doctrine of dependent relative revocation, the will was entitled to probate. There, it will be

noted, the testator attempted to substitute for the destroyed will another means of disposing of his estate which he intended should operate as a will. He did not intend to leave the descent and distribution of his property to the operation of law.

 Neither of the cited cases mentions any procedural statute relative to the proof of lost and destroyed wills. We shall not discuss the numerous other American cases which have applied the doctrine where the act of destruction of a will was connected with the attempted execution of a new will, nor shall we consider whether, in the absence of a restrictive statute, the doctrine would be applicable in the case at bar. The determinative question here, we think, is this: Can the will be admitted to probate under our statute governing the character of proof required for the establishment of lost or destroyed wills? If the doctrine does apply, the will was not validly revoked, but, even if we should so hold, the will nevertheless would have to run the gauntlet of the lost wills statute. Adopting the language of the supreme court of Minnesota in a case involving a similar problem, *In re Havel's Estate,* 156 Minn. 253, 194 N. W. 633, 34 A. L. R. 1300, our crucial question is "one purely of statutory construction and bristles with difficulty."

Rem. Rev. Stat., § 1390 [P. C. § 10046], in part, provides:

"Whenever any will be lost or destroyed, the superior court shall have power to take proof of the execution and validity of such will and to establish the same, notice to all persons interested having been first given. Such proof shall be reduced to writing and signed by the witnesses and filed with the clerk of court.

"No will shall be allowed to be proved as a lost or destroyed will unless the same shall be proved to have been in existence at the time of the death of the testa-

tor, or be shown to have been fraudulently destroyed in the lifetime of the testator, nor unless its provisions shall be clearly and distinctly proved by at least two witnesses, . . ."

In the instant case, the provisions of the will presented for probate were "clearly and distinctly proved by at least two witnesses," but was the will "in existence at the time of the death of the testator"? In a literal sense, it was not in existence, but appellant contends that the statute does not require actual physical existence. All that is necessary, he maintains, is existence in contemplation of law, and, since Lothaire Kerckhof's will was not destroyed *animo revocandi*, it was, in that sense, in existence at his death.

The statute was designed to promote certainty and to prevent fraud in the proof of lost and destroyed wills. It is in harmony with the well-established legislative policy of this state that, with some minor exceptions, every will must be in writing and attested by at least two witnesses. The cases in which this court has been called upon to construe it throw but little light upon our present problem. There is nothing in them to indicate, however, that the words "destroyed" and "existence" in the statute should not be given their plain, common, everyday meaning. In fact, in the case of *In re Calvin's Estate,* 188 Wash. 283, 62 P. (2d) 461, we said, p. 287, 288, that the statute "definitely and emphatically" supplies a rule for the proof of a lost or destroyed will, and that it requires two essential things, the proof of each of which must be clear and convincing: "(1) That it be proved that the will was in existence at the time of the death of the testator, and (2) that its provisions be clearly and distinctly proved by two witnesses."

For convenience of reference, we again set out the key portion of the statute, Rem. Rev. Stat., § 1390:

"No will shall be allowed to be proved as a lost or destroyed will unless the same shall be proved *to have been in existence at the time of the death of the testator, or be shown to have been fraudulently destroyed in the lifetime of the testator,* . . ." (Italics ours.)

If we are to adopt appellant's construction and hold that "existence" means legal survival, then we must necessarily, in effect, delete from the statute as meaningless surplusage the phrase "or be shown to have been fraudulently destroyed in the lifetime of the testator." For would not a fraudulently destroyed will still be in existence in contemplation of law in the sense that it had not been destroyed *animo revocandi?* The fact that the legislature inserted the fraudulent destruction clause is a clear indication that, when it used the words "lost or destroyed will," it had reference to a will which had been reduced to writing; and, when it said that such will must be proved to have been in existence at the time of the death of the testator, it meant—just as the language plainly signifies—the physical existence of the written document.

There have been brought to our attention only two states which have lost will statutes practically identical to our own, New York and Minnesota. The courts of the former have taken the position that "existence" means physical existence, while the supreme court of the latter has held that existence in contemplation of law is sufficient. The Minnesota case of *In re Havel's Estate,* 156 Minn. 253, 194 N. W. 633, *supra,* is appellant's principal reliance on the question now under consideration.

Barbora Havel made her will, and died five days later. It was in the Bohemian language, and, to take its place, an English translation was immediately prepared and signed by her. The English will was not eligible to probate, however, because the witnesses

had not signed it in the proper manner. The two wills had not been in the custody of the testatrix after she signed them. The Bohemian will disappeared on the day of its execution and could not thereafter be found. The Minnesota supreme court held that it could be probated as a destroyed will notwithstanding a statute substantially the same as our Rem. Rev. Stat., § 1390, above quoted.

The opinion assigned two main grounds for the holding: First, the court pointed out that a Minnesota statute governing the revocation of wills and similar to the Washington statute (see Rem. Rev. Stat., § 1398, *supra*) plainly implied that a will is not validly revoked if it is lost or destroyed without the knowledge or consent of the testator, or is canceled or destroyed by him without an intention to revoke. If the lost wills statute were so construed as to require proof of *physical* existence at the testator's death, the Minnesota court reasoned, it would come into direct conflict with the revocation statute, because it would, in effect, reject as revoked every will lost or destroyed in the testator's lifetime, without fraud, even though the loss or destruction had been without *animus revocandi* or without the testator's knowledge or consent. The court conceded that, in construing the term "existence" to mean legal existence, it was obliged virtually to read out of the Minnesota lost wills statute as surplusage the fraudulent destruction clause, but frankly stated that it preferred to do so rather than permit the practical revocation of a will by loss or unintentional destruction. We quote from the opinion, p. 256, as follows:

"Then comes section 7280, consisting entirely of negative provisions, particularly the one preventing the establishment of the lost or destroyed will, 'unless the same is proved to have been in existence at the time of the testator's death, or to have been fraudulently

destroyed in his lifetime.' Had the disjunctive phrase concerning fraudulent destruction 'in his lifetime' been omitted, there would be no difficulty in reaching the conclusion that existence in legal effect, as distinguished from the existence of the paper and writing, is all that the legislature intended to demand. *The fraudulent destruction clause makes that result difficult.* Either it negatives the legislature's intention, so carefully expressed in section 7256, to prevent revocation by accidental loss or destruction, or it must be considered as surplusage. A holding making that clause surplusage is less objectionable, however, than one which will read into another section of the statute language which is not there and produce an effect not only beyond, but opposed to, the legislative intention there expressed." (Italics ours.)

In its second ground of decision in the *Havel* case, the court pointed out that the doctrine of dependent relative revocation had been well established in Minnesota and cited three of its prior decisions in which the doctrine had been applied. It then said, p. 257:

"This doctrine was in existence at the adoption of our Probate Code. If it was the legislative intent to limit its application to cases where the conditionally revoked will was not destroyed, such limitation would not have been left to the mere inference to be drawn from section 7280, standing alone, that physical existence of the document, at the testator's death, was necessary in order to admit to probate a lost or destroyed will."

The following excerpts taken from the closing paragraphs of the opinion, we think, are significant:

"The decisions in other states are not harmonious. The weight of authority may be against the view here expressed, if result alone is considered.

"The most cogent argument which has been advanced against our conclusion is that our statute was taken from New York and that the construction there is the other way. See *Grant v. Grant,* supra [1 Sand. Ch. 235]; *Knapp v. Knapp,* 10 N. Y. 276, *Timon v.*

*Claffy,* 45 Barb. 438; *Voorhis v. Voorhis,* 50 Barb. 119.

"But we consider that argument overborne by the necessity of maintaining intact our statute of revocation, G. S. 1913, § 7256, and the other considerations above noted."

In so far as they are apposite in this state, under the circumstances of the instant case, we are not inclined to adopt either of the grounds of decision of *In re Havel's Estate.* As to the first ground, there can be no real direct conflict between our revocation statute and our lost wills statute, because the former is a substantive law, while the latter is a procedural act specifying the character of proof required to establish lost and destroyed wills. If there be any conflict as to results, the procedural act should prevail, as, otherwise, it may be rendered largely nugatory. Manifestly, we can not say that every will which has not been revoked in accordance with the revocation statute should be admitted to probate regardless of the requirements of the lost wills act. For example, an unrevoked lost or destroyed will susceptible of proof by only one witness could not be established. With reference to the second ground of decision of the *Havel* case, this court has only once recognized the doctrine of dependent relative revocation, and that was long after the adoption in 1917 of the probate code, in which the lost wills statute, Rem. Rev. Stat., § 1390, appears. *In re Appleton's Estate,* 163 Wash. 632, 2 P. (2d) 71.

That case did not mention the statute for the very good reason that it was in no way involved. The testatrix, after duly executing a will, had attempted to alter its provisions by drawing pencil lines through the typewritten words of certain portions and by making interlineations in her own handwriting. After her death, the will was presented for probate. The court held that, since the testatrix had canceled certain bequests

for the sole purpose of transferring them to another beneficiary, and the attempted transfer proved to be ineffective because of the informal method pursued, under the doctrine of dependent relative revocation, the bequests would not be considered revoked, but, in legal effect, would be restored as originally written. The distinguishing feature of the *Appleton* case is that, there, the will was in physical as well as legal existence at the time of the death of the testatrix.

Appellant also cites *In re Eder's Estate,* 94 Colo. 173, 29 P. (2d) 631. In that case, the court construed the word "existence" to mean existence in contemplation of law rather than physical existence, but the Colorado lost wills statute, as set out in the opinion, contained no fraudulent destruction clause—the clause we regard as indicative of the legislative intent in our statute and the one the Minnesota court found so troublesome in the *Havel* case. Appellant also cites *In re Nickels' Estate,* 114 Me. 338, 96 Atl. 238. The Maine statute involved in that case likewise, so far as the opinion shows, is substantially different from our lost wills law. In the words of *In re Eder's Estate:* "As is so often the case where statutes are involved, the decisions of other jurisdictions are rendered valueless by the varying language of the enactments."

Without reviewing them in detail, we call attention to the following cases involving lost wills statutes generally similar to ours in which the California and Indiana courts have required proof of the *physical* existence of a lost or destroyed will at the time of the testator's death. *Estate of Kidder,* 57 Cal. 282; *In re Patterson's Estate,* 155 Cal. 626, 102 Pac. 941; *Kellogg v. Ridgely,* 161 Ind. 110, 67 N. E. 929.

In his well-reasoned article on Dependent Relative Revocation in 5 So. Cal. L. Rev., p. 273, *supra,* Mr. Francis T. Cornish of the Berkeley bar has this to

say with reference to the relation of the doctrine to lost wills statutes (see p. 413):

" 'Proof of Lost Wills' statutes no doubt have cut deeply into the scope of the operation of the doctrine of dependent relative revocation. In some States, such as New York, and California, the term 'existence,' as used in these statutes, is interpreted as signifying actual or physical existence. Where such a construction is given, it would seem to exclude from the operation of the doctrine all cases in which the will for which probate is sought has been destroyed in such a manner that it no longer has physical existence.

"To avoid this nullification of the doctrine of dependent relative revocation, some courts have interpreted the term 'existence' as the equivalent of 'legal existence.' " [At this point in the text, there is a reference to the following footnote: "This interpretation of existence would seem to be unsound. It ignores the ordinary meaning of 'existence.' "]

Then, after quoting from the opinion in the *Havel* case, the writer of the article continues, p. 414:

"Of the two lines of cases, the California and New York cases no doubt arrive at the proper result. While the doctrine of dependent relative revocation is to be favored and, we might say, given an even broader application than it now receives, it is, to say the least, not easy to appreciate any soundness in a decision which goes as far as does the opinion of Mr. Justice Stone in *In re Estate of Havel,* in setting aside an express statutory rule of evidence, obviously intended as a protection against fraud, because the court disagrees with the legislature as to the policy of the enactment and desires to reinforce a purely judicial scheme of carrying out the true intention of the testator."

It is our conclusion that, since it affirmatively appears from the record in the instant case that the will was not in existence at the time of the death of the testator, the provisions of Rem. Rev. Stat., § 1390, bar it from admission to probate.

Appellant further contends that, even though

we conclude that the will was not in existence at the testator's death, we should find that it was fraudulently destroyed in his lifetime within the meaning of § 1390. There was, of course, no actual fraud, as no intentional deception whatsoever was practiced upon the testator, and the attorney who advised the destruction of the will, the record shows, acted in the utmost good faith. Appellant cites in support of his contention two New York cases, each by a surrogate's court, in which the words "fraudulently destroyed" in the lost wills statute of that state have been construed to embrace constructive fraud: *In re Dorrity's Will*, 118 Misc. 725, 194 N. Y. Supp. 573; *In re Breckwoldt's Will*, 170 Misc. 883, 11 N. Y. S. (2d) 486. Whether or not we would follow the cited decisions in a proper case, we need not now decide. They are both factually distinguishable.

In the *Dorrity* case, the testatrix took her will to an attorney and requested him to add a provision to it. At the attorney's direction, his stenographer recopied the last three pages and added a new clause. Believing that the revised instrument would immediately be executed, the stenographer took out of the will the pages containing the signature of the testatrix and of the attesting witnesses and substituted therefor the newly written sheets. The testatrix, who had gone out to "do some shopping," never came back. Upon her death, the original pages of the will could not be found. The court held that the will had been "fraudulently destroyed," but, in the words of the opinion, p. 727:

"The proof is that the stenographer mislaid, lost or destroyed the sheets of the executed will *unknown to the decedent*. It is undeniable that the testatrix did not destroy the executed will, nor was it destroyed in her presence, or by her direction, or with her consent or knowledge." (Italics ours.)

In the *Breckwoldt* case, a housemaid, in clearing out a linen closet, carelessly and without the knowledge of

the testator, destroyed a will which the latter had deposited there. The court held that there had been a fraudulent destruction of the will.

In each of the New York cases, the will was destroyed without the knowledge or consent of the testator by the careless or mistaken acts of another. In the instant case, the will was destroyed in the testator's presence and at his express direction. True, he acted upon the advice of an attorney, erroneously believing that, should he die intestate, all of his property would go to his brother Louis, but, essentially, the mistake was his own, not that of the attorney. The will was destroyed without the execution of a new one because the testator had informed the attorney that his brother Louis was his only living relative. A man cannot perpetrate a fraud, either actual or constructive, upon himself.

Judgment affirmed.

MAIN, STEINERT, and BLAKE, JJ., concur.

MILLARD, J. (dissenting)—Our statute (Rem. Rev. Stat., § 1390) does not demand, in order to admit to probate a destroyed will, that the same should have been in physical existence at the testator's death. As held in *In re Havel's Estate,* 156 Minn. 253, 194 N. W. 633, 34 A. L. R. 1300, existence of the will in contemplation of law, unrevoked, is all that is required. The written evidence of the will, which was destroyed during the testator's life, was not destroyed at the request of the testator for the purpose of revoking his will. Revocation is a question of intent, and the testator never intended revocation of his will.

"A revocation grounded on supposed facts, which turn out not to exist, falls when the foundation falls." *Sanderson v. Norcross,* 242 Mass. 43, 136 N. E. 170, 171.

While the testator intended the destruction of the paper on which his will was written, he did not intend—he so declared—revocation of his will. The destruction of the paper was caused by mistake and misunderstanding. The will should be admitted to probate, as, in contemplation of law, it was in existence, unrevoked, at the time of the testator's death. To hold to the contrary is to sacrifice substance to form. No good purpose would be served by writing a lengthy dissent and citing the many authorities which sustain my position.