[1] Reported in 183 P.2d 995.
This is an appeal from an order denying a petition contesting the rejection of a will for probate.
R. Walter DeLion had been married twice. There was born the issue of the first marriage, one daughter, Audrey, who at the time of the hearing was an adult and married, the wife of Gordon D. Berg. Of the second marriage, he had one daughter, Louisa, who, at the time of the hearing, was fifteen years of age.
In 1938, Mr. DeLion obtained a divorce from his second wife and was awarded the custody of Louisa. Mrs. DeLion later married Dr. Green (whom DeLion blamed for breaking up his home) and moved to California.
Mr. DeLion showered all of his affections upon this younger girl. On December 14, 1939, he deposited a will in Louisa's favor with the Old National Bank in Spokane. On the same day, he created with the bank a living trust for her benefit, covering certain real property owned by him. The will was withdrawn February 26, 1942. On February 28, 1942, he filed a supplemental trust agreement, and a new will was deposited March 2, 1942, in which it provided that Louisa should be placed in Mrs. Logsdon's (his former wife's sister) care in case of his death.
In the summer of 1945, Louisa went to visit her aunt, Mrs. Logsdon, in Boise, Idaho. While there, her mother and Dr. Green also visited Mrs. Logsdon. Upon Louisa's return to Spokane, she informed her father of her desire to live with her mother. To dissuade her, he took her on a trip to Canada, but it was to no avail; her mind was made up. It was then agreed that she would go to her mother for the school year, coming home for Christmas, and returning for the summer. It was distinctly understood that he was not releasing her custody, which had been granted to him in the divorce hearing.
Louisa left that fall to go to her mother in California. Mr. DeLion was heartbroken over her going and would speak of his troubles with anyone who would listen. Shortly after Louisa left, Mr. DeLion decided to revoke the living trust, since she was being taken care of by her mother. On October *Page 651 
15, 1945, he went to the bank and revoked the living trust and, at the same time, withdrew his will. Later, various people saw him working on some papers in his apartment. He explained that he was working on his will, which he said was being held up because he was attempting to sell some of his property. He died suddenly on November 25, 1945. In his apartment were found the following three documents, which were taken to the office of L. Vincent Donahue, Mr. DeLion's attorney, and which were later introduced in this hearing as exhibits Nos. 1, 2, and 3, respectively. The words, "O.K. down to blue line R.W. DeLion," in exhibit No. 1, and all of exhibits Nos. 2 and 3 were written in ink in DeLion's handwriting. Paragraphs Nos. 3 and 4 of the will were crossed off with a blue pencil. [These paragraphs are shown in italics. REP.]
 Exhibit No. 1 "LAST WILL AND TESTAMENT OF R. WALTER DELION
"I, R. WALTER DELION, of Spokane, Washington, being of sound and disposing mind and memory and not laboring under the duress, menace, fraud or undue influence of any person or persons whomsoever, do hereby make, publish and declare this my last Will and Testament, hereby revoking any and all other Wills and Testaments by me made.
"At the time of making this my Last Will and Testament, I am an unmarried man and I have in mind my married daughter, Audrey DeLion Berg.
"FIRST: It is my will and I direct that all of my just debts, expenses of my last sickness and funeral expenses be paid out of my estate and that I be given a conservative funeral, and it is my wish, if possible, that I be buried in the Elks' Rest of Spokane Lodge No. 228, of which I am a member and I desire to have used in connection with said burial expense, a Four Hundred Dollar Funeral benefit payable from Local 185 International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada.
"SECOND: I give, devise, and bequeath unto my daughter, Audrey DeLion Berg, all interest I have in a certain Sales Agreement entered into on the 22nd day of September, 1941 between Anchor Securities Company, a corporation as vendor and myself as purchaser, of the following property:
"The West thirty-five (35) feet of Lot Twelve (12) in Block Thirteen (13), Chamberlin's Addition to Spokane *Page 652 
Falls, now Spokane, and in the event that I acquire title to said property, then I desire that said property be given to my said daughter Audrey DeLion Berg.
 O.K. down to blue lines R.W. DeLion
"THIRD: I hereby nominate and appoint The Old National Bank ofSpokane, Washington, as Executor of this, my Last Will andTestament and direct that said Executor serve without bonds andwithout the intervention of the probate court, after firstcomplying with the statutes of the State of Washington withreference to the administration of estates.
"FOURTH: All the rest, residue and remainder of my estate ofevery kind, character and description and whereever situated Igive, devise, and bequeath unto The Old National Bank of Spokane,Washington as trustee for the following purposes, to-wit:
 "I desire my said trustee in the event of my death, to manage,sell, invest, re-invest any and all property of said trust estatein its discretion for the best interests of said trust estate; itbeing my desire that the powers granted said trustees besufficiently broad to cover any and every contingency that mayarise and leave no question over which to litigate with referenceto the handling of said trust estate.
 "I hereby give said trustee full authority to execute anytransfer, conveyances, assignments, mortgages, agreements, orother documents which it may be required to execute in connectionwith the real or personal property of said trust estate and whichmay be necessary for the proper handling of said trust estateunder the provisions of this Will.
 "Said trustee is further authorized to rent, lease, mortgageor sell any real or personal property which may become a part ofthis trust estate and to expend such sums from the trust fund asit might deem advisable for the protection, conservation andmaintenance of any and all of the trust property, charging suchexpenditures against the income or principal as it may deemproper.
 "SAID TRUST FUND IS TO BE HELD AND USED IN THE FOLLOWING MANNER: "(a). It is my desire that said trust fund be used wholly forthe maintenance, education and support of my daughter, Louisa AnnVirginia DeLion, and my said trustee shall have the right in itssole and uncontrolled discretion at any time and from time totime to pay over to my daughter, Louisa Ann Virginia DeLion, suchportions of the principal and income of the trust estate as theTrustee may deem necessary *Page 653 or proper for the support and welfare of my daughter, Louisa AnnVirginia DeLion until such time as she reaches the age oftwenty-five (25) years, at which time I desire that my entiretrust estate be distributed to her and it is my desire that inthe event of my decease, that my daughter, Louisa Ann VirginiaDeLion be sent to her aunt, Mrs. R.M. Logsdon, residing at 421Mountainview Drive, Boise, Idaho who has expressed a desire andwillingness to have and care for her and I have instructed mytrustee to make proper allowances to her for my daughter's care.
 "(b) In the event that my daughter, Louisa Ann Virginia DeLionshould pre-decease me or should die before the distribution of mytrust estate to her, then in that event, it is my desire and Idirect that my entire trust estate be distributed to my daughter,Audrey DeLion Berg.
 "No part of the principal of the Trust Estate, and no part ofthe net income herein described, shall be by any beneficiaryalienated, pledged, hypothecated, transferred, assigned,conveyed, encumbered or otherwise disposed of while in the handsof the Trustee, nor shall the principal or net income be subjectto any lien, by judgment, contract, or otherwise, while in thehands of the Trustee. In the event of any alienation, pledge,hypothecation, transfer, assignment, conveyance or attemptedencumbrance or disposal of any of the principal or net incomewhile in the hands of the Trustee, the Trustee is authorized anddirected not to pay over any portion, or portions, of theprincipal or net income so sought to be alienated, hypothecated,transferred, pledged, assigned, conveyed or otherwise encumberedor disposed of, or upon which a lien is attempted to be placed,to the beneficiary entitled to receive the same, but in theexercise of its sole, sound and uncontrolled discretion to use orapply such portion, or portions, of principal or net incomedirectly to, or for the uses hereinabove set forth, or to retainsuch portions as principal or invested income, as will be for thebest interests of the trust estate and the beneficiaries thereof.The purpose of this provision is to prevent any beneficiary fromanticipating or transferring his interest herein prior to thetime of actual distribution.
 "The Trustee may employ such agents and counsel as arereasonably necessary in collecting, managing and protecting thetrust estate, using due diligence in their selection, and theircompensation, as well as reasonable and proper expenses incidentto the operation, protection or defense of said fund shall bepaid from the gross income or principal of said trust estate.During the operation of this trust said *Page 654 Trustee shall be allowed such compensation as is being currentlycharged for like services by banks or trust companies in the Cityof Spokane.
 "In the event THE OLD NATIONAL BANK OF SPOKANE shall at anytime become a part of any other corporation or association orshall be merged or consolidated with any other corporation orcorporations, association or associations, into a new corporationor association, then such corporation or association of which itbecomes a part or successor corporation or association of saidThe Old National Bank of Spokane, shall without any further actbe substituted in place of The Old National Bank of Spokane asTrustee hereunder and shall be subject to all the duties,liabilities and responsibilities imposed upon said The OldNational Bank of Spokane hereunder.
"IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of March, 1942.
"R. WALTER DELION
"The foregoing instrument, consisting of three pages besides this one, was at the date set forth above, by R. WALTER DeLION, the maker, signed in our presence, and in the presence of each of us, and at the time of his subscribing said instrument, he declared it to be his Will and at his request, in his presence and in the presence of each other, we have subscribed our names as witnesses thereto.
 "EARL E. STIMSON "WITNESS "Residing at Spokane, Washington. "L. VINCENT DONAHUE "WITNESS "Residing at Spokane, Washington.
"This instrument prepared by:
 "L. VINCENT DONAHUE, "Attorney-at-Law "421 Symonds Building "Spokane, Washington."
 Exhibit No. 2
"3rd I give, devise, bequeath unto my daughter Louisa Ann Virginia DeLion all government bonds, series E. registered in hers my name all G series 2 1/2% Bonds registered in my name only —
"4th I give, device bequeath unto my son in law Gordon D. Berg for his many kindnesses my automobile.
"5th I give, device bequeath unto my grandson Donald Walter Berg — a $1,000. Series E Bond. *Page 655 
"6th All the rest, residue and remainder of my estate of every kind, character and description and wherever situated I give, devise bequeath unto my two daughters Audrey DeLion Berg 
Louisa Ann Virginia DeLion to be divided equally between them. with the exception of such pieces of furniture silver ware ect. which are Louisa Ann Virginia DeLion personal property having been given to her as presents.
"7 — In the event that my daughter Louisa Ann Virginia DeLion should pre-decease me, then in that event, it is my desire I direct that my entire estate shall go to my daughter Audrey DeLion Berg.
"It is my wish that my daughter Audrey DeLion Berg be appointed Administrator of this will to act without bond.
"R. WALTER DELION"
 Exhibit No. 3
"The reason I am holding up the putting of this will into regular form — I am waiting until the sale of property at 117 to 123 W. Boone Ave. — with the thought of taking part of the money received from this sale to buy my daughter Louisa one more $1,000. Series E. Bond. My grandson Donald Walter Berg one $1,000. series E Bond. with his mother as coowner.
"And to reduce the sales agreement balance on the property at 1830 W. Boone I am leaving to my daughter Audrey DeLion Berg the $1,000.00 balance due.
"R. WALTER DELION."
On December 22, 1945, the will (exhibit No. 1) was presented for probate, together with the other papers (exhibits Nos. 2 and 3), and, after a hearing, the court rejected the will and denied the petition to have it admitted as the last will and testament of R. Walter DeLion. Subsequently, this contest was filed, and, after a hearing, in which several witnesses were examined and twenty exhibits were introduced, the petition in contest was dismissed. This appeal follows.
[1] Appellant invokes the doctrine of dependent relative revocation. A definition of this doctrine appears in an annotation in 62 A.L.R. 1367, 1401, subd. 7, and is reiterated in a supplemental annotation in 115 A.L.R. 710, 721:
"When a will, or portions thereof, are canceled or mutilated in order to change the will in whole or in part, and the attempt fails for want of due authentication, or other cause, this effort to revoke in whole or in part will be treated as *Page 656 
relative and dependent upon the efficacy of the new disposition intended to be substituted; and hence, if the attempted disposition is inoperative, the revocation fails also, and the original will remains in force. This rule is styled the doctrine of dependent relative revocation. It is based upon the presumption that the testator performed the act of revocation with a view and for the purpose of making some other disposition of his property in place of that which was canceled, and that there is, therefore, no reason to suppose that he would have made the change if he had been aware that it would have been wholly futile, but that his wishes with regard to his property, as expressed in his original will, would have remained unchanged, in the absence of any known and sufficient reason for changing them."
 Discussing this rule in In Re Kerckhof's Estate, 13 Wn.2d 469, 125 P.2d 284, we said:
"Very briefly, the rationale of the doctrine is this: To effect the revocation of a will, two elements are essential, an overt act and animus revocandi; and there can be no real intention to revoke when the act of destruction or cancellation is induced and motivated by a mental misconception of the effect of the act on account of ignorance, or mistake, or some other error."
Rem. Rev. Stat., § 1398 [P.P.C. § 219-9], describes how a will can be revoked:
"No will in writing, except in cases hereinafter mentioned, nor any part thereof, shall be revoked except by a subsequent will in writing, or by burning, canceling, tearing, or obliterating the same, by the testator or testatrix, or in his or her presence, by his or her consent or direction."
The question resolves itself down to this: Did Mr. DeLion, when he crossed off, with a blue pencil, paragraphs Nos. 3 and 4 of his will, intend by that act to then revoke his will, or was it his intention to later revoke it by making a new will?
Louis Brunk, the trust officer at the bank, testified that when Mr. DeLion canceled the living trust and took the will, he stated that he had no further use for the trust because he intended to sell the place in the trust account. As to the will, Mr. Brunk testified: *Page 657 
"A. Well, he stated that he was taking it out, that he expected that he was going to make some changes in the will."
Henry B.F. Robertson, with whom the trust property was listed for sale, testified that DeLion said that he had canceled his trust and was going to make a new will.
Mrs. Ann Louise Young, who had known DeLion for a number of years, testified as follows concerning conversations with him several days after he had left the hospital:
"And he said, `I am occupied now with changing my will completely.'"
Helen Puelz testified about seeing him working on some papers in his apartment. She saw the lines running down the page. She testified:
"Q. What did he say with regard to the lines that he had drawn on the old will? A. He said, `I know just exactly what I want to do, but I can't say it and make it sound right. I am going by this for wording.' He was using the old document, as I understand it at that time just for ideas for wording the new one. Q. What did he say, if anything, regarding the old document and the parts that he had drawn lines through? A. He said, `I don't want this.' He was crossing this out. Q. What? A. I mean crossing out the old will that he didn't want to use, and he was using the old one for wording on the new one. At least that is what he told me one evening."
Under cross-examination, she testified:
"A. He said, `I have been working on the will and I am drawing lines in the parts that I wish changed, that I don't want.' I remember distinctly his saying that, because he was explaining the blue lines. Q. It was the impression that you got that he had just placed the lines on the paper? A. Yes."
L. Vincent Donahue, who had been DeLion's attorney for ten or eleven years, and who had drawn both wills and the trust agreement, met Mr. DeLion on the street a week or so before his death. Mr. DeLion seemed to be broken up because he had lost Louisa. Mr. Donahue testified:
"He said, `That trust of Louisa's has all been done away with.'. . . And he said, `I am making a few notes and *Page 658 
I will be up to your office in a few days and I want you to draw me a new will.'"
At the close of his testimony, he was questioned by Mr. Blade:
"Q. May I try to refresh your recollection? I may be mistaken but I thought you had told me that Mr. DeLion at that time and place said something to the effect that he had canceled his will. Am I wrong? . . . A. He didn't use those words."
Lt. Robert E. Lee, who was stationed at Spokane and who resided on the floor above Mr. DeLion, testified as follows in answer to a question by respondent's attorney concerning DeLion's statement about having an appointment with his attorney.
"Q. Did he say, `I am going to have my lawyer write a new will,' or did he say, `I am going to see my lawyer about changing my will,' which was it? A. I think it was the second there."
Lt. Lee's wife testified:
"A. He told me once that he had gone down to the bank where he had his will in trust and had gotten his will. . . . A. And he had said he had broken it or he was going to break his will and prepare a new one."
She further testified:
"A. I went in one day and he told me that he was working on his will and there was a piece of paper on his desk . . . Q. Did you see a document with any lines drawn through it there? A. Yes, there was a typewritten instrument. Q. Typewritten paper? A. Yes, I think it was typewritten, yes, with some lines drawn through it, and that was before him at that time. Q. When he was talking to you? A. When he said, `I am preparing another will,' or, `Preparing a will,' I believe he said."
She further testified:
"A. The first time he told me, I have no idea when it was, it was either October or November, 1945. He said, `I went to the bank today and I got my will,' and he said, `I have broken it,' or `I am breaking it.' He used the verb `break.' Q. He actually used that word? A. Yes, but I can't tell you what tense it was. Q. Was there another time? A. There *Page 659 
was a later time, I went in and this paper was on his desk, and he said, `I am working on my will.'"
Mr. DeLion was heartbroken because Louisa had gone to her mother and would tell his troubles to anyone who would listen to him. Mr. DeLion told a number of people that he had broken the active trust, but the only witness who swore positively that he said he had canceled his will was his son-in-law, Gordon Berg.
[2] His remarks to the various witnesses, as well as his physical acts in connection with exhibits Nos. 1, 2, and 3, would warrant a logical conclusion either way. We feel that the evidence preponderates in favor of the conclusion that it was his intention to later revoke his will by executing a new one, for the following reasons: Although several witnesses testified that he told about revoking the active trust, no witness, except Gordon Berg, testified positively that he said he had revoked his will. His whole history, from the time he made the first will and created the active trust, demonstrates the orderly procedure of a man who knows what he is doing at all times, and who has no desire to die intestate. After leaving paragraphs Nos. 1 and 2 in his will and crossing out paragraphs Nos. 3 and 4, he created, in his notes in exhibit No. 2, paragraphs Nos. 3, 4, 5, 6, and 7, thus preparing a complete new will. And then, for fear someone might misinterpret his actions, he wrote exhibit No. 3 explaining his reasons for his delay in having the new will drawn up.
However, Rem. Rev. Stat., § 1387 [P.P.C. § 218-5], provides:
"In any such contest proceedings the previous order of the court probating, or refusing to probate, such will shall be prima facie evidence of the legality of such will, if probated, or its illegality, if rejected, and the burden of proving the illegality of such will, if probated, or the legality of such will, if rejected by the court, shall rest upon the person contesting such probation or rejection of the will."
In In re Bottger's Estate, 14 Wn.2d 676, 129 P.2d 518, we said: *Page 660 
"If the will has been probated and is thereafter contested, the burden of proving its illegality is, by statute (Rem. Rev. Stat., § 1387 [P.C. § 10019]), imposed upon the person contesting such probation, and, according to the above decisions, that burden can be met only by producing clear, cogent, and convincing evidence of the invalidity of the will."
The same burden would fall upon a person contesting the rejection of a will. Having the above rule in mind, we do not believe that the contestant has sustained the statutory burden of proving the legality of the will. The order denying the petition in contest is, therefore, affirmed.
MALLERY, C.J., MILLARD, SIMPSON, and ABEL, JJ., concur.
September 19, 1947. Petition for rehearing denied.